582 F.2d 259
 Fed. Sec. L. Rep. P 96,510
Harold CRAMER, custodian for Patricia Gail Cramer, Appellant,
v.
GENERAL TELEPHONE & ELECTRONICS CORPORATION and Leslie H.
Warner, Theodore F. Brophy, John J. Douglas,
William F. Bennett and Arthur Andersen & Co.
 No. 77-2372.
 United States Court of Appeals,
Third Circuit.
 Argued June 5, 1978.
Decided July 18, 1978.
As Amended Aug. 8, 1978.
 
 Mitchell A. Kramer, Steven Kapustin, Stuart Peim, Kramer & Salus, Philadelphia, Pa., for appellant.
 Peter M. Fishbein, Steven J. Glassman, Myron Kirschbaum, Kaye, Scholer, Fierman, Hays & Handler, New York City, for appellees Warner, Brophy & Douglas.
 Peter H. Morrison, Benjamin Zelermyer, Gerald G. Paul, Bobbe A. Brown, Morrison, Paul & Beiley, New York City, for appellee Bennett; Arthur H. Kahn, Joseph A. Tate, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., of counsel.
 John G. Harkins, Jr., Patricia L. Freeland, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for appellee General Telephone & Electronics Corp.; Dean C. Rohrer, Samuel J. Wilson, General Telephone & Electronics Corp., Stamford, Conn., of counsel.
 Before GIBBONS, ROSENN and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge:
 
 
 1
 This is an appeal from the termination of a shareholder's derivative suit brought by Harold Cramer[1] on behalf of the shareholders of General Telephone & Electronics Corporation (GTE). The defendants are Leslie H. Warner, Theodore F. Brophy, John J. Douglas, and William Bennett, directors of the corporation, and Arthur Andersen & Co., GTE's auditors. In his complaint, the plaintiff contends that the defendants (1) violated Sections 10(b), 12(b) (1), 13(a), and 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78L (b)(1), 78m(a), & 78n(a), and the regulations promulgated thereunder, (2) defrauded the corporation in violation of state law, and (3) breached their common-law fiduciary duties to the corporation. Plaintiff's Complaint, P 10. The district court, 443 F.Supp. 516, granted the defendants' joint motion for summary judgment on the §§ 13(a) and 14(a) claims on the ground that such claims were barred by res judicata. The court dismissed the claims under § 10(b), Rule 10b-5, and § 12(a) for failure to state claims upon which relief could be granted. Fed.R.Civ.P. 12(b)(6). The state-law claims were dismissed on two grounds res judicata and lack of subject matter jurisdictions. Although we disagree somewhat with the reasons underlying the district court's decision, we affirm its judgment in all respects.[2]
 
 I.
 
 2
 The thrust of the plaintiff's claim is that the corporation was injured by the making of illegal overseas payments by GTE subsidiaries to foreign governmental officials and to private persons. The plaintiff contends that the defendants participated both in the making of the payments and in the failure to disclose the payments in reports disseminated to GTE stockholders. Paragraph 14 of the complaint contains the major allegations:
 
 
 3
 14. During a period commencing at a time unknown to plaintiff, and continuing at least until November, 1975, defendants, in violation of the Exchange Act and the Rules and Regulations promulgated thereunder and in violation of the Common law in connection with General participated, and/or acquiesced in, and/or aided and abetted, and/or failed to discover when in the exercise of due diligence they would have discovered, devices, schemes and artifices to defraud General, to waste the assets of General, to utilize the assets of General for unlawful purposes, to falsify the records of General, to defraud the United States Government by falsifying tax returns; to make untrue statements of material facts and to omit to state material facts in reports disseminated to shareholders of General; and, in the case of the individual defendants, breached their fiduciary duties and obligations to General.
 
 
 4
 Cramer rests his allegations largely on the findings which appear in a report on a special investigation conducted by the Audit Committee of the Board of Directors of GTE. That report, which is incorporated by reference in paragraph 15 of the plaintiff's complaint, was distributed to the shareholders as part of the proxy statement prior to the stockholders' annual meeting on April 21, 1976. The Audit Committee, which consisted of four outside directors who had not been involved in the questionable transactions, had been authorized by the Board of Directors to determine whether between January 1, 1971, and December 31, 1975, GTE or any of its international subsidiaries had made "illegal political contributions, unlawful payments to domestic or foreign government officials or other payments which were otherwise improper or improperly recorded. . . ." Audit Committee Report (Exhibit A to Plaintiff's Complaint), at 13. The Committee was assisted by the Washington, D. C. law firm of Wilmer, Cutler and Pickering, which had never previously represented GTE, and by the accounting firm of Arthur Andersen, a defendant herein.
 
 
 5
 After investigating GTE's international operations for three months, the Audit Committee produced a 51-page report. That report, which was dated March 4, 1976, revealed that GTE and its subsidiaries had paid approximately $8 million to, or for the benefit of, foreign governmental officials. Most of these payments took the form of commercial kickbacks, rebates, or bribes to officials of private foreign customers. Another sum of approximately $21/2 million was paid pursuant to a pre-January 1, 1971 commission arrangement between GTE officials and officers of a single foreign company (called the "Customer" in the Audit Committee's report). This commission arrangement stemmed from GTE's sale of its substantial ownership interest in the Customer to a private investment company controlled by a group of foreign nationals (the "Group"). The foreign government itself had urged GTE to make the sale. Since the purchasing group did not have adequate financial resources to acquire GTE's interest, GTE agreed to finance part of the purchase price by paying the Group commissions on future GTE equipment sales to the Customer. After being told that a competitor would agree to such an arrangement if it declined to do so, GTE agreed to pay the commissions to a company designated by the purchasers and located in a third country.[3] Members of the Group became officers and directors of the Customer. Audit Committee Report, at 22.
 
 
 6
 The Audit Committee found that Warner, Brophy, Douglas, and Bennett, the defendants herein, had been involved, in varying degrees, "in the negotiation, formalization and implementation" of the commission arrangement described above. Id. at 28. Bennett was found to be at least aware of two other questionable financial transactions. However, the Committee concluded that none of these directors profited personally from these payments and that all of them believed they were acting in the best interests of the corporation. Id. at 28-29. The Committee's report did not discuss the possibility of litigation against these directors, and its recommendations to the Board did not include the pursuit of such litigation.[4]
 
 
 7
 After the Audit Committee's report had been distributed to the GTE shareholders, three separate derivative suits were filed in different courts. The first of these was brought by Elias Auerbach, a GTE stockholder, against the same defendants as are named in the instant litigation. Auerbach's suit, which was filed in the Supreme Court of New York in Westchester County on March 16, 1976, alleged that the illegal payments constituted a waste of GTE's assets and that the defendants, by permitting such payments, had breached their fiduciary duties to the corporation. Two weeks later, Ralph Limmer filed another shareholder's derivative suit in the United States District Court for the Southern District of New York, charging that Warner, Brophy, Douglas, and Bennett had violated §§ 13(a) and 14(a) of the 1934 Act and had breached their fiduciary duties to the shareholders. Arthur Andersen was not made a defendant in that action. Finally, on June 18, 1976, Cramer commenced the present suit in the United States District Court for the Eastern District of Pennsylvania.
 
 
 8
 Cramer did not, before filing this suit, make a demand upon the GTE directors to institute the litigation. See Fed.R.Civ.P. 23.1. In paragraph 13 of his complaint, he alleges that such a demand would have been futile since the Audit Committee had not recommended litigation against the directors and since, in his opinion, the individual defendants dominated the Board of Directors.
 
 
 9
 On April 21, 1976, after the Auerbach and Limmer actions had been filed but before the instant action had been commenced, GTE's Board of Directors resolved to create a Special Litigation Committee to assess GTE's position with respect to the shareholders' derivative suits.[5] After Cramer had filed the instant lawsuit, the Board authorized the Committee to examine that suit too. The Committee consisted of three outside directors who had not been members of the Board of Directors at the time the events described in the Audit Committee's report occurred. Chief Judge Charles S. Desmond, now retired from the New York Court of Appeals, served as Special Counsel to the Committee.
 
 
 10
 After examining the work of the Audit Committee, the Special Litigation Committee made several findings and recommendations. The Committee found first that the investigation by the Audit Committee had been "complete, comprehensive and thorough." Special Litigation Committee Report, at 11. Judge Desmond informed the Committee members that in his opinion neither the state nor the federal claims were meritorious. The Special Litigation Committee advised GTE's General Counsel to take the position in Limmer and Cramer that the federal claims were meritless, that the state-law claims should be dismissed for lack of subject matter jurisdiction, and that the suits, even if meritorious, were not in the best interests of GTE or its shareholders and thus should not be prosecuted on GTE's behalf. The Committee recommended that the Auerbach action be opposed as being contrary to the best interests of GTE or its shareholders.[6]
 
 
 11
 Relying on the conclusions of the Special Litigation Committee, the defendants moved to dismiss the complaints in Auerbach and Limmer. The state court dismissed Auerbach's complaint on the ground that this Committee's business judgment that the suit was not in GTE's best interests barred the prosecution of the suit. Auerbach v. Bennett, No. 572/77 (Sup.Ct. of New York, Westchester County, April 29, 1977). In Limmer, the district court dismissed the § 14(a) claim for failure to state a claim upon which relief could be granted. The § 13(a) claim was voluntarily withdrawn by the plaintiff and later dismissed with prejudice. Once the federal claims had been terminated, the district court dismissed the pendent state-law claims for lack of subject matter jurisdiction. Limmer v. General Tel. & Elec. Corp., 76 Civ. 1494 (S.D.N.Y. March 11, 1977).
 
 
 12
 The defendants also moved to dismiss the complaint in the present case. The defendants claimed that all the federal claims were barred, under principles of res judicata and collateral estoppel, by the district court's decision in Limmer. The district court below agreed that Cramer's §§ 13(a) and 14(a) claims were barred by res judicata. However, because claims under §§ 10(b) and 13(b)(1) require elements of proof different from those necessary under §§ 13(a) and 14(a), the court concluded that those claims were not barred by Limmer. Nevertheless, the court dismissed the § 10(b) and Rule 10b-5 claims on the grounds: (1) that the alleged fraud was not in connection with the purchase or sale of a security; (2) that GTE was not damaged by the fraudulent activities; and (3) that the plaintiff's complaint failed to allege that the defendants had intended to defraud the corporation. The § 12(b)(1) claim was dismissed because the plaintiff had not satisfied the standing requirements of § 18(a) of the 1934 Act, 15 U.S.C. § 78r(a).[7] The state-law claims were dismissed for two reasons. First, the court concluded that those claims were precluded by the res judicata effect of the New York judgment in Auerbach. Secondly, even assuming that the claims were not barred by res judicata, the district court declined to exercise its pendent jurisdiction over those claims. See United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The plaintiff filed a timely notice of appeal from the district court's decision.[8]
 
 II. SECTION 14(a) CLAIM[9]
 
 13
 The doctrine of res judicata bars repetitious litigation of the same cause of action. As the Supreme Court has explained, the doctrine "rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations." Commissioner of Internal Revenue v. Sunnen, 333 U.S. 591, 597, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). Once a court of competent jurisdiction has entered a final judgment on the merits of a particular cause of action, the parties to that action are bound not only by every matter which was offered and considered in reaching that judgment, but also by every other matter which could have been offered. Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195 (1876); Hubicki v. ACF Industries, Inc., 484 F.2d 519, 524 (3d Cir. 1973). Absent circumstances which would render inequitable the application of res judicata, a judgment on the merits will generally not be disturbed by a court in a subsequent suit involving the same parties.
 
 
 14
 We agree with the district court that the Limmer decision bars Cramer's § 14(a) claim against the directors. In Limmer, the district court granted the directors' motion to dismiss the plaintiff's § 14(a) claim. The court explained its decision as follows:
 
 
 15
 Section 14(a), after all, contemplates the prevention, or redress, of such injury as would be, or is, directly traceable to a transaction authorized by a corporate electorate in the partial light of a misleading proxy solicitation. . . . In the present case, by contrast, the damages claimed, if actually suffered, flow from breach of a fiduciary obligation owed as a director or officer, rather than from any shareholder vote obtained by false proxy solicitation materials.
 
 
 16
 Limmer Opinion, at 4. Before a judgment can be given res judicata effect, both the parties and the issues in the prior and subsequent suits must be identical. Expert Elec., Inc. v. Levine, 554 F.2d 1227, 1233 (2d Cir.), Cert. denied, 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977). Both of these conditions are satisfied here. Limmer's and Cramer's claims arose out of the same transactions. All four directors named as defendants in the instant case were defendants in Limmer. In a shareholder's derivative suit, the substantive claim belongs to the corporation. See Ross v. Bernhard, 396 U.S. 531, 538-39, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). Although different shareholders brought the two actions, the actual plaintiff on whose behalf the claims were brought is the identical corporation, GTE. Since the Limmer court's dismissal of the § 14(a) claim is a final judgment on the merits and since the other requirements of res judicata are met, the plaintiff here cannot relitigate the § 14(a) claim against the directors in this or any other forum.
 
 
 17
 Cramer argues, however, that the individual defendants should be judicially estopped from asserting the res judicata bar of the Limmer judgment. In making this argument, Cramer relies on a single letter sent by the defendants' counsel to the district court in response to a question from the court. In that letter, the relevant portion of which is quoted in the margin,[10] counsel stated that consolidation of the instant case with Limmer would be premature. Cramer contends that since in that letter the defendants' counsel stated that the parties and issues in the two suits differed, they should be estopped from contending now that the judgment in Limmer bars his claim under § 14(a). We agree with the district court that this argument "approaches absurdity." 443 F. Supp. at 526. No motion was ever filed under 28 U.S.C. §§ 1404(a) or 1407 to transfer the instant case to the Southern District of New York or to consolidate the two actions. Thus, at the time the letter was written, the question of the similarities between the two suits was not squarely before the court. Since no question was ever directly before the court, we do not think that the principle of judicial estoppel should preclude the defendants from asserting the res judicata bar of Limmer.
 
 
 18
 The district court also held that Arthur Andersen was entitled to summary judgment on the § 14(a) claim by virtue of the Limmer decision. We agree, though we base our decision on collateral estoppel, not res judicata. Although Arthur Andersen would not have been bound by a judgment in Limmer adverse to the defendants, we think it is entitled to avail itself of a judgment favorable to those defendants. Mutuality of estoppel is no longer required for the principle of collateral estoppel to apply, at least "where the prior judgment (is being) invoked defensively in a second action against a plaintiff bringing suit on an issue he litigated and lost as plaintiff in a prior action." Blonder-Tongue Laboratories, Inc. v. University Foundation,402 U.S. 313, 324, 91 S.Ct. 1434, 1440, 28 L.Ed.2d 788 (1971). See Bruszewski v. United States, 181 F.2d 419, 421 (3d Cir.), Cert. denied,340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950); Bernhard v. Bank of America Nat. Trust & Sav. Ass'n, 19 Cal.2d 807, 122 P.2d 892 (1942). See generally Currie, Mutuality of Collateral Estoppel: Limits of the Bernhard Doctrine, 9 Stan.L.Rev. 281 (1957). As long as the unsuccessful plaintiff had a full and fair opportunity to litigate the issue in the prior lawsuit, he will not be permitted to reassert the identical claim against a different defendant in a second suit. Bruszewski v. United States, 181 F.2d at 421. The plaintiff in Limmer had a full and fair opportunity to litigate the § 14(a) claim in that forum. He had every incentive to prosecute vigorously the action against the individual defendants. There is no indication either that Limmer could not have recovered from the individual directors or that he could have recovered additional damages from Arthur Andersen. Under these circumstances, the judicial interest in avoiding repetitive litigation must prevail. Cramer is collaterally estopped from asserting the § 14(a) claim on behalf of GTE against Arthur Andersen.[11]
 
 III. SECTION 13(a) CLAIM
 
 19
 In its opinion, the district court devoted very little attention to the effect of Limmer on Cramer's § 13(a) claim.[12] The court's entire discussion appears as follows:
 
 
 20
 The claim asserted under § 13 was voluntarily withdrawn by the plaintiff in Limmer and dismissed with prejudice pursuant to stipulation. Limmer, supra, page a, fn. 1. (Defendant's Motion for Summary Judgment, June 7, 1977, page 23.) Thus, res judicata bars Cramer's claims under both §§ 13 and 14(a).
 
 
 21
 443 F. Supp. at 521.
 
 
 22
 Cramer contends that the district court erred in according full res judicata and collateral estoppel effect to the voluntary dismissal of the § 13(a) claim in Limmer. Relying on Papilsky v. Berndt, 466 F.2d 251 (2d Cir.), Cert. denied, 409 U.S. 1077, 93 S.Ct. 689, 34 L.Ed.2d 665 (1972), Cramer argues that in order for a voluntary dismissal in a derivative suit to bar a later derivative suit brought by a shareholder who was not a party in the first one, that shareholder must have had notice of the voluntary dismissal. We agree.
 
 
 23
 Rule 23.1 of the Federal Rules of Civil Procedure provides that a shareholder's derivative action "shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to shareholders or members in such manner as the court directs." The notice requirement of Rule 23.1 is not restricted to dismissals following settlements, but extends as well to voluntary dismissals under Rule 41(a). Papilsky v. Berndt, 466 F.2d at 257; 3B J. Moore, Federal Practice P 23.1.24(2) (1978). See also Certain-Teed Prod. Corp. v. Topping, 171 F.2d 241, 243 (2d Cir. 1948) (applying notice requirement to plaintiff-shareholder's consent to entry of summary judgment against him). The wisdom of this rule is clear. Although a derivative action is brought by a single shareholder, the named plaintiff represents both the corporation itself and the entire class of stockholders. Notice is essential to ensure that the dismissal of the derivative action comports with the best interests of the corporation and its shareholders. If notice of a proposed voluntary dismissal were not required to be given to nonparty shareholders, the plaintiff or his counsel might be tempted to enter into a collusive settlement with the defendants. In addition, the notice requirement guards against dismissals which are due primarily if not entirely to the named plaintiff's change of heart about prosecuting the action. Finally, if notice were not required and if the dismissal were to occur after the statute of limitations had run, the dismissal would bar any prosecution of the claim against the corporate officials. Papilsky v. Berndt, 466 F.2d at 258. We conclude that before a shareholder's derivative action can be voluntarily dismissed, notice of the dismissal must be sent to nonparty shareholders. Absent such notice, the voluntary dismissal will not bar a subsequent action by a shareholder who did not participate in the prior suit.
 
 
 24
 The defendants claim, however, that Limmer's § 13(a) claim remained pending until it was involuntarily dismissed by the court. Since the claim was still pending, the defendants contend, the court was not required to give notice to nonparty shareholders. We find this argument unpersuasive. Limmer stipulated to the dismissal of his § 13(a) claim. The district court did not rule on the merits of Limmer's cause of action, but instead dismissed the claim with prejudice pursuant to that stipulation. Where the parties stipulate to the dismissal of a derivative action prior to any adjudication of the merits, all of the policies underlying the notice requirement are implicated. The district court's dismissal of the claim with prejudice magnifies the need for notice to the other shareholders. Since no notice was given, the voluntary dismissal cannot be given res judicata or collateral estoppel effect.
 
 
 25
 Any other result, we think, would raise serious due process questions. Nonparty shareholders are usually bound by a judgment in a derivative suit on the theory that the named plaintiff represented their interests in the case. But that rationale is valid only if the representation of the shareholders' interests was adequate. Papilsky v. Berndt, 466 F.2d at 260. Cf., Hansberry v. Lee, 311 U.S. 32, 44-46, 61 S.Ct. 115, 85 L.Ed. 22 (1940). Rule 23.1 itself forbids a court from going forward with a derivative action "if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders . . ." The voluntary dismissal of a cause of action raises some doubt as to whether the named plaintiff vigorously prosecuted that particular claim. The notice requirement of Rule 23.1 helps to ensure that the shareholders' interests are adequately represented in any dismissal prior to adjudication on the merits. Since notice of a proposed voluntary dismissal must be sent to nonparty stockholders for that dismissal to be given res judicata and collateral estoppel effect, we need not decide whether Limmer adequately represented the interests of the stockholders.
 
 
 26
 Although Cramer's § 13(a) claim is not foreclosed by Limmer, the lower court's dismissal of that claim should nevertheless be affirmed. Section 13 is one of several statutory provisions requiring the filing of applications, documents, and reports with the Securities Exchange Commission. See also §§ 12(b), 12(g), 15(b)(1), 16(a), and 17(a) of the Act, 15 U.S.C. §§ 78L (b),78L (g), 78O (b)(1), 78p(a), & 78q(a). In enacting § 13(a), Congress intended to protect investors by ensuring that they would receive adequate periodic reports concerning the operation and financial condition of corporations. See S.Rep.No.792, 73rd Cong., 2d Sess. 11 (1934). Section 18,15 U.S.C. § 78r, provides a civil remedy for damages resulting from the purchase or sale of a security in reliance upon a misleading statement in a document or report filed with the SEC. See In re Penn Central Securities Litigation, 347 F.Supp. 1327, 1340 (E.D.Pa.1972), Modified in part, 357 F.Supp. 869 (E.D.Pa.1973), Aff'd, 494 F.2d 528 (3d Cir. 1974). Although GTE's sale of its ownership interest in the foreign subsidiary qualifies as a sale of securities within the meaning of §§ 13(a) and 18, that sale was not made in reliance upon a false statement in an annual report filed by GTE with the SEC. Absent that causal nexus, Cramer's complaint fails to state a cause of action in favor of GTE under these sections. In fact, at oral argument in this case, Cramer's counsel conceded that his complaint "probably did not" state a claim under § 13(a). Accordingly, we affirm the district court's entry of summary judgment in favor of the defendants on the § 13(a) claim.
 
 IV. SECTION 10(b) AND RULE 10b-5 CLAIMS
 
 27
 Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b),[13] and Rule 10b-5, 17 C.F.R. § 240.10b-5,[14] promulgated thereunder make unlawful the use of any deceptive or manipulative device in connection with the purchase or sale of a security. See Superintendent of Ins. v. Bankers Life & Cas. Co.,404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Where it is alleged that corporate officials have defrauded the corporation in connection with the purchase or sale of securities, a shareholder's derivative action under § 10(b) can be maintained against those officials. See Pappas v. Moss, 393 F.2d 865, 869 (3d Cir. 1968). Such a derivative action can be maintained, however, only if the corporation itself was a purchaser or seller of securities. See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).
 
 
 28
 Cramer contends that the overseas payments by GTE's subsidiaries constituted a fraud on the corporation in violation of § 10(b) and Rule 10b-5.[15] Specifically, he argues that, because of these payments, GTE failed to receive adequate consideration for the sale of its equipment and, in one instance, for the sale of its ownership interest in a foreign company (the "Customer"). The district court concluded that GTE had bought or sold securities within the meaning of § 10(b) and thus that Cramer had standing to assert the claim on behalf of the corporation.[16] Nevertheless, the court dismissed the § 10(b) claim for three reasons:
 
 
 29
 Cramer's § 10(b) and Rule 10b-5 claims against the defendants fail when the court asks whether the manipulative devices, the alleged fraud and the alleged breaches of fiduciary duty were "In connection with " the purchase or sale of any security and whether these activities resulted in any Damage to GTE.
 
 
 30
 The complaint herein is devoid of any allegation that either the defendant officers, the Corporation or the accountants Intended to defraud GTE.
 
 
 31
 District Court Opinion, 443 F.Supp. at 523, 524 (emphasis added). In our opinion, none of these grounds provides a sufficient basis for dismissing Cramer's complaint on a Rule 12(b)(6) motion.
 
 A. The "In-Connection-With" Requirement
 
 32
 The district court did not explain its statement that the allegedly fraudulent activities were not in connection with the purchase or sale of a security. Cramer contends that the court's conclusion is erroneous for two reasons. First, he urges that GTE's payment of commissions on its equipment sales to the company designated by the foreign investors was part of the same financing package whereby GTE sold its ownership interest in the Customer to the Group. By paying commissions on the later sales, GTE allegedly paid the purchase price with its own funds and thus received inadequate consideration for the sale of its controlling interest in the Customer. This, Cramer alleges, constituted a fraud in violation of § 10(b) and Rule 10b-5. Secondly, Cramer claims that the other foreign payments disclosed in the Audit Committee's report were made in the "same general time frame" as sales of stock by GTE.
 
 
 33
 We need not decide the correctness of Cramer's second contention, for we conclude that the complaint sufficiently alleges that the commissions on the equipment sales were paid in connection with GTE's sale of its controlling interest in the Customer. As the district court stated, See footnote 12 Supra, the sale of this ownership interest does constitute a sale of securities under § 10(b) and Rule 10b-5. The defendants claim that any damages to GTE caused by the commission arrangement were sustained in connection not with the sale of securities, but with the subsequent sales of equipment to the foreign company. We think that the defendants are taking a much too narrow view of the financing arrangement whereby GTE agreed to sell its interest in the Customer to the group of foreign investors. GTE's promise to pay commissions on equipment sales was not a separate agreement. Rather, that promise was an essential part of GTE's original agreement to sell its interest in the foreign company. The following excerpt from the Audit Committee report makes this connection abundantly clear:
 
 
 34
 Since the Group did not have sufficient financial resources to purchase GTE's interest, it was agreed that GTE would finance a part of the purchase price by paying the Group a commission on sales of equipment by GTE to the Customer.
 
 
 35
 Audit Committee Report, at 22. Since the commission payments were inextricably linked to GTE's sale of its ownership interest in the Customer, we think the district court erred in concluding that the alleged fraud was not alleged to be in connection with the sale of a security.
 
 B. Injury to GTE
 
 36
 Nor do we agree with the district court that GTE was not, for purposes of a Rule 12(b)(6) motion, injured by the allegedly fraudulent devices. In reaching this conclusion, we focus, as did the district court, on GTE's sale of its ownership interest in the foreign company. The Audit Committee found that GTE paid out approximately $21/2 million in commissions in connection with the sale of its interest in that company. GTE made these payments because the foreign investors were unable to finance the entire purchase price. In effect, GTE supplied some of the money which it received in exchange for its own stock. Surely, such a transaction, if proved, would establish a prima facie injury to the corporation.
 
 
 37
 The Audit Committee found that GTE entered into this arrangement only after it had been informed that, if it declined to do so, one of its competitors would agree to pay similar commissions. Relying on this finding, the district court concluded that without the commission arrangement GTE would not have been able to sell its equipment to the Customer. Since the commission arrangement in effect saved business for GTE, the court concluded, that arrangement did not damage GTE.
 
 
 38
 A complaint should not be dismissed under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 L.Ed.2d 80 (1957). See 2A J. Moore, Federal Practice P 12.08, at 2274 (2d ed. 1975). Applying this standard, we think the district court could not properly dismiss Cramer's complaint on the ground that GTE was not injured by the allegedly fraudulent activities. The Audit Committee did not find that the commission arrangement necessarily saved business for GTE. That Committee found only that GTE Was told that if it did not enter into such an arrangement, one of its competitors would agree to a similar deal. The report does not indicate that GTE explored the veracity of the investors' statement before it entered into the arrangement. It is quite possible that no competitor in fact offered to enter into a similar agreement. Even assuming that the commission arrangement saved business for GTE, we still cannot be sure, at this posture of the case, that GTE was not injured by the transaction. Neither the Audit Committee nor the district court compared the total amount of commissions with the profits generated by GTE's equipment sales to these foreign investors. Since no such comparison was undertaken, we cannot be certain that the commission arrangement benefited GTE. The district court could not properly terminate the claim at such an early stage on this ground.
 
 C. Allegation of Intent to Defraud
 
 39
 As stated earlier, a private cause of action will not lie under § 10(b) or under Rule 10b-5 unless the plaintiff alleges scienter i. e., an intent to deceive, manipulate, or defraud. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The district court concluded that Cramer's complaint failed to allege that the defendants intended to defraud the corporation. Relying on Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 444-45 (2d Cir. 1971), it reasoned that the facts constituting both the fraud and the scienter must be alleged with particularity. District Court Opinion, 443 F.Supp. at 524.
 
 
 40
 Under the Federal Rules of Civil Procedure, most complaints need be phrased only in general terms sufficient to put the defendants on notice as to the nature of the claims being asserted against them. See Fed.R.Civ.P. 8(a). However, Rule 9(b) imposes additional requirements where the complaint alleges fraud. That rule, which applies to claims alleging fraudulent activities in violation of the federal securities laws, See Segal v. Gordon, 467 F.2d 602, 606-08 (2d Cir. 1972); Shemtob v. Shearson, Hammill & Co., 448 F.2d at 444-45, reads:
 
 
 41
 (b) Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.
 
 
 42
 The district court failed to recognize the differences between the two sentences of Rule 9(b). The first sentence of that rule requires that the complaint state with particularity the circumstances constituting the fraud. It was this part of Rule 9(b) which formed the basis for the dismissal of the complaint in Shemtob. But the problems with the complaint in Shemtob are absent here. Paragraph 15 of Cramer's complaint incorporates by reference the entire report of the Audit Committee. That report describes in detail the facts of the foreign payments, including the commissions paid in connection with GTE's sale of its ownership interest in the foreign company. By incorporating this committee's report, Cramer's complaint clearly satisfies the specificity requirement of the first sentence of Rule 9(b).
 
 
 43
 The second sentence of Rule 9(b) requires only that "intent, knowledge, and other condition of mind . . . be averred Generally." (emphasis added). In paragraph 14 of his complaint, Cramer alleges that the "defendants . . . participated, and/or acquiesced in, and/or aided and abetted, and/or failed to discover when in the exercise of due diligence they would have discovered, devices . . . to defraud General. . . ." Certainly, this general allegation of the defendants' state of mind meets the minimal requirements of the second sentence of Rule 9(b).
 
 
 44
 The defendants claim, however, that this allegation fails to meet the standard of Ernst & Ernst v. Hochfelder. We disagree. In Ernst & Ernst, the Supreme Court held that an allegation of negligence was insufficient to sustain a cause of action for damages under Rule 10b-5. The Court declined to determine whether recklessness could support such a cause of action. 425 U.S. at 194 n.12, 96 S.Ct. 1375. We need not decide here whether an allegation of recklessness is sufficient under § 10(b) and Rule 10b-5, for we think that Cramer's complaint adequately alleges intent, at least on the part of the individual directors.[17] The complaint alleges that the defendants knowingly participated in a scheme to defraud GTE. Indeed, the Audit Committee itself found that the four directors had been involved in the negotiation, formalization, and implementation of the commission arrangement. When corporate officials have actively participated in such a scheme with full knowledge of the consequences of their acts, such officials, we think, have acted with scienter within the meaning of Ernst & Ernst. See In re Clinton Oil Co. Securities Litigation, CCH Sec.Law Rptr., P 96,015 (D.Kan. March 18, 1977). The Audit Committee's finding that the directors did not profit secretly from these payments does not alter our conclusion. If the directors here intended to commit acts which constituted a fraud upon the corporation, whether or not their acts were motivated by good faith is irrelevant. Since we believe that the complaint adequately alleges scienter on the part of the directors, we cannot affirm the district court's dismissal of Cramer's § 10(b) and Rule 10b-5 claims on this ground.[18]
 
 
 45
 D. Shareholder's Demand on the Directors and the Business Judgment Rule
 
 
 46
 The defendants assert several grounds for affirmance which were not considered by the district court. Principally, they argue that the Special Litigation Committee's determination that Cramer's derivative suit is not in the best interests of the corporation bars the prosecution of this suit. The defendants emphasize that the directors who comprised that Committee were not part of inside management and had not served as directors when the questionable events occurred, thereby guaranteeing the independence of their determination. Moreover, the Committee acted in good faith and with the full authority of the Board of Directors. Accordingly, the defendants claim, that Committee's determination was a business judgment of GTE's management that the derivative suit should not proceed a business judgment which is insulated from judicial review and which bars the maintenance of the derivative suit. See Gall v. Exxon Corp., 418 F.Supp. 508 (S.D.N.Y.1976).
 
 
 47
 The business judgment rule originated as a means of limiting the liability of corporate directors and officers for mistakes made while performing their duties. Absent bad faith or some other corrupt motive, directors are normally not liable to the corporation for mistakes of judgment, whether those mistakes are classified as mistakes of fact or mistakes of law. See Briggs v. Spaulding, 141 U.S. 132, 11 S.Ct. 924, 35 L.Ed. 662 (1891); 3A W. Fletcher, Corporations, ch. 11, § 1039 (1975 ed.). The rationale for the rule is that in order for the corporation to be managed properly and efficiently, directors must be given wide latitude in their handling of corporate affairs.
 
 
 48
 Some courts have applied the business judgment rule to bar a shareholder's derivative action where an independent board of directors has determined that such an action would not be in the best interests of the corporation. In United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, 263, 37 S.Ct. 509, 510, 61 L.Ed. 1119 (1917), the Supreme Court stated:
 
 
 49
 Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders. Courts interfere seldom to control such discretion Intra vires the corporation, except where the directors are guilty of misconduct equivalent to a breach of trust, or where they stand in a dual relation which prevents an unprejudiced exercise of judgment . . . .
 
 
 50
 This circuit previously considered the business judgment rule as a bar to shareholders' derivative suits in Ash v. International Business Machines, Inc., 353 F.2d 491, 492-93 (3d Cir. 1965), Cert. denied, 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966), and in Miller v. American Tel. & Tel. Co., 507 F.2d 759 (3d Cir. 1974). In Ash, a minority stockholder in three corporations competing with IBM sued IBM to enjoin it from acquiring another corporation. The plaintiff contended that this acquisition would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Because the directors of the three corporations had refused the plaintiff's demand that they sue IBM, we affirmed the district court's dismissal of the complaint. We held that in the absence of any showing that the directors' refusal to sue was collusive or in bad faith, the directors' business judgment barred the plaintiff's suit on behalf of the corporation. In Miller, stockholders in AT&T brought a derivative action against the corporation and its directors, alleging that the directors' failure to collect a $1.5 million debt from the Democratic National Committee constituted an illegal campaign contribution and a breach of the directors' fiduciary duty to the corporation. We acknowledged that the directors' judgment that the derivative action was not in the best interests of the corporation would normally bar the suit. 507 F.2d at 762. Nevertheless, we reversed the district court's dismissal of the complaint, holding that where the "decision not to collect a debt owed the corporation is itself alleged to have been an illegal act," the directors' judgment cannot bar the derivative suit. Id.
 
 
 51
 The business judgment rule as a bar to a shareholder's derivative action is inextricably linked to the requirement in a number of jurisdictions that the plaintiff-shareholder first make a demand on the directors to pursue the claim. See, e. g., Fed.R.Civ.P. 23.1; Colo.R.Civ.P. 23.1; N.Y.Bus.Corp.Law § 626(c) (McKinney 1963). Rule 23.1 of the Federal Rules of Civil Procedure requires that the shareholder's complaint "allege with particularity" either the efforts made to obtain the desired action from the directors or the reasons for not making such an effort. Once the shareholder has made a demand upon the directors, the directors are then able to determine whether in their opinion a suit on behalf of the corporation would comport with the best interests of the corporation.
 
 
 52
 Important policies underlie both the demand requirement and the business judgment rule as a bar to shareholders' derivative actions. The demand requirement enables corporate management to pursue alternative remedies, thus often ending unnecessary litigation. Moreover, deference to the directors' judgment might terminate meritless causes of actions and prevent the corporation from incurring the costs of participating in derivative suits. Even if a particular suit has some merit, the litigation costs and the adverse effect on the business relationship between the corporation and the potential defendant might outweigh any potential recovery in the lawsuit. Finally, derivative actions could be brought not to remedy wrongs to the corporation, but to induce settlements beneficial to the named plaintiff or his counsel. See Note, The Demand and Standing Requirements in Stockholder Derivative Actions, 44 U.Chi.L.Rev. 168, 168 (1976).
 
 
 53
 On the other hand, shareholders' derivative suits can be important weapons for remedying abuses of corporate management. Thus, while the demand requirement of Rule 23.1 should be rigorously enforced, we do not think that the business judgment of the directors should be totally insulated from judicial review. In order for the directors' judgment to merit judicial deference, that judgment must have been made in good faith and independently of any influence of those persons suspected of wrongdoing. In addition, where the shareholder contends that the directors' judgment is so unwise or unreasonable as to fall outside the permissible bounds of the directors' sound discretion, a court should, we think, be able to conduct its own analysis of the reasonableness of that business judgment. The opinions in United Copper Securities Co.,[19] and Miller[20] both suggest that courts have some limited power to review the reasonableness of the directors' judgment that a derivative suit is not in the best interests of the corporation.[21]
 
 
 54
 Neither United Copper Securities Co., Ash, nor Miller discusses in any depth whether state or federal law determines the effect of the business judgment rule on a Rule 23.1 derivative action. At oral argument in this case, both counsel argued that the law of the state of incorporation governs this question. To be sure, in Miller we applied the law of New York to determine whether the directors' judgment barred the derivative action. But the federal claim asserted in Miller was inextricably linked to the state law claim for wasting corporate assets. It is not at all clear that state law should determine the effect of the directors' judgment on a derivative action under the federal securities laws, where Congress has expressed a more comprehensive interest.[22]
 
 
 55
 In the instant case, we need not decide whether state or federal law governs the scope of review by a court of the business judgment decision not to pursue a cause of action. Nor do we have to decide whether the Special Litigation Committee's judgment should bar Cramer's derivative suit, for in our opinion the complaint should have been dismissed for failing to comply with the demand requirement of Rule 23.1. In Shlensky v. Dorsey, 574 F.2d 131 (3d Cir. 1978), we affirmed a district court's dismissal of a defendant in a derivative action on the ground that the amended complaint failed to allege either an adequate demand on the corporate directors to sue that defendant or a sufficient reason for failing to make that demand. In affirming the dismissal, we stated that the amended complaint "failed to comply with the express requirements of Rule 23.1 which are mandatory. . . ." 574 F.2d at 142. We reach the same conclusion here.
 
 
 56
 In paragraph 13 of his complaint, Cramer admits not having made a demand upon GTE's directors. He claims that such a demand would have been futile, however, since the Audit Committee had not recommended litigation against the defendants and since the individual defendants herein dominated the Board of Directors. Courts have sometimes permitted derivative actions to go forward without a demand on the directors where such a demand would have been futile and where the plaintiff-shareholder has alleged with particularity the reasons why a demand would have been futile. See, e. g., Nussbacher v. Continental Illinois Nat. Bank & Trust Co., 518 F.2d 873, 878-79 (7th Cir. 1975), Cert. denied, 424 U.S. 928, 96 S.Ct. 1142, 47 L.Ed.2d 338 (1976). In the instant case, however, Cramer's complaint does not adequately explain why he failed to make a demand upon the directors. Cramer correctly states that the Audit Committee did not recommend litigation against the directors. But so far as the complaint discloses, that Committee had not been instructed to determine whether litigation against the directors would be appropriate. Its primary functions were to examine GTE's foreign business transactions, to disclose any questionable overseas payments, and to suggest internal procedures for remedying the prior practices. We do not believe that the Audit Committee's report necessarily demonstrated management's opposition to an action against the directors who had participated in the foreign activities in which the payments had been made. To be sure, the Special Litigation Committee later opposed the maintenance of Cramer's derivative action. But that Committee's determination was made after Cramer had already commenced his suit. The futility of making the demand required by Rule 23.1 must be gauged at the time the derivative action is commenced, not afterward with the benefit of hindsight. At the time Cramer filed his complaint, the Board of Directors had not yet expressed opposition to such derivative actions.
 
 
 57
 Nor do we think that the defendants herein so dominated the Board of Directors as to make a demand on the Board futile. At the time Cramer commenced this suit, there were 14 individuals on GTE's Board of Directors. Only four of these were named as defendants in this action. The remaining ten directors had not been involved in the allegedly fraudulent activities. Indeed several of the directors had not even been members of the Board at the time the questionable transactions occurred. Under these circumstances, we cannot agree with Cramer that the four directors named as defendants in the instant case dominated the Board to such an extent that the plaintiff should be excused from the mandatory requirement of Rule 23.1 that he first make a demand on the directors.[23] Accordingly, we affirm the district court's dismissal of Cramer's § 10(b) and Rule 10b-5 claims.[24]
 
 V.
 
 58
 Cramer argues, however, that the district court should not have dismissed his complaint without affording him adequate discovery. But Cramer's claims were all dismissed because they are legally insufficient. We fail to see how additional discovery could have cured those insufficiencies. Thus, we conclude that the district court did not abuse its discretion in declining to grant the plaintiff additional discovery prior to dismissing his complaint.
 
 VI.
 
 59
 The judgment appealed from will be affirmed.
 
 
 
 [1]
 Harold Cramer is the custodian of the GTE common stock for Patricia Gail Cramer, a minor. Plaintiff's Complaint, P 1
 
 
 [2]
 The district court also denied the plaintiff's motion for a protective order. That decision is not before us on appeal
 
 
 [3]
 The Audit Committee found that GTE International had paid the Group $373,872 in commissions and had applied another $2,271,481 in earned commissions to reduce the principal amount owed by the Group for its purchase of GTE's substantial interest in the Customer. In addition, as of December 31, 1975, GTE International had on its books $1,678,000 in accrued but unpaid commissions earned under this arrangement. Audit Committee Report, at 22
 
 
 [4]
 The Committee recommended only: (1) "that the Board instruct management to submit to the Board at an early date its plans to prevent a recurrence of the problems that have occurred," and (2) that GTE urge the United States Government to "mount a major political and diplomatic effort to formulate and enforce a common code of ethical standards for the conduct of international business." Audit Committee Report, at 30-31
 
 
 [5]
 In forming this Committee, GTE's Board of Directors claimed that they were acting pursuant to § 712 of the New York Business Corporation Law and to § 20 of GTE's corporate by-laws
 
 
 [6]
 The Committee also found (1) that the defendant directors had acted "with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions," Special Litigation Committee Report, at 12, and (2) that Arthur Andersen had acted in accordance with accepted auditing standards and in good faith, Id. at 14
 
 
 [7]
 The district court explained that part of its holding as follows:
 The complaint herein contains none of the allegations required to establish standing under § 18. There is no allegation that the corporation relied on any false or misleading filings in making any sale; there is no allegation that any filing affected the price of GTE securities. Finally, there is no causal nexus made, or even attempted, between any filing and any alleged loss which GTE suffered.
 
 
 [443]
 F. Supp. at 525
 
 
 [8]
 On this appeal, Cramer does not contend that the district court erred in dismissing his § 12(b)(1) claim or his state-law claims. Thus, we need not decide the correctness of those dismissals
 
 
 [9]
 Section 14(a) reads:
 (a) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78L of this title.
 15 U.S.C. § 78n(a).
 
 
 [10]
 The last paragraph of this letter reads:
 "Although it is conceivable that, should both actions survive Motions to Dismiss, consolidation or coordination of pre-trial discovery may be appropriate, where there are different parties and issues in the respective pleadings, and where motions to dismiss on jurisdictional grounds may dispose of the actions at the pleading stage, it is our view that any such consolidation or coordination would be premature and inappropriate at this time."
 Letter from Joseph A. Tate, Esquire, to the Honorable A. Leon Higginbotham, dated September 10, 1976. App. at 363a.
 
 
 [11]
 Arthur Andersen contends that an independent auditor cannot be held liable under § 14(a) and Rule 14a-9, 17 CFR § 240.14a-9, which together impose liability for misleading statements on those who either solicit proxies or permit the use of their names in soliciting proxies. Since we hold that Arthur Andersen is entitled to avail itself of the protection of collateral estoppel, we need not consider this claim
 
 
 [12]
 Section 13(a) reads:
 (a) Every issuer of a security registered pursuant to section 78L of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security
 (1) such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 78L of this title, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.
 (2) such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe.
 15 U.S.C. § 78m(a).
 
 
 [13]
 Section 10(b) reads:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 15 U.S.C. § 78j(b).
 
 
 [14]
 The text of Rule 10b-5 reads as follows:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
 in connection with the purchase or sale of any security.
 
 
 [17]
 C.F.R. § 240.10b-5
 
 
 [15]
 Although Cramer has asserted a § 10(b) claim on behalf of GTE against the defendants, neither Auerbach nor Limmer made comparable claims. Auerbach's failure to assert a § 10(b) claim is understandable, since federal courts have exclusive jurisdiction over suits alleging violations of this statutory provision. See § 27 of 1934 Act, 15 U.S.C. § 78aa; Wolfson v. Blumberg, 229 F.Supp. 191, 192 (S.D.N.Y.1964), Appeal dismissed, 340 F.2d 89 (2d Cir. 1965). Limmer brought suit in a federal forum, however, and thus could have asserted a § 10(b) claim if he had chosen to do so
 
 
 [16]
 In concluding that Cramer had standing to bring this claim, the district court noted first that a corporation's issuance of its own shares is a sale of securities within the meaning of § 10(b) and Rule 10b-5. Securities & Exch. Comm'n v. National Sec., Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). The court then stated:
 The complaint recites several instances in which GTE either bought or sold securities. In one transaction, GTE sold its substantial ownership interest in one subsidiary company to a group of foreign nations under a commission arrangement wherein GTE allegedly did not ultimately receive full value. (Complaint, Exhibit A, pp. 21-22). Three other transactions are contained in GTE's 1975 Annual Report: in 1974 GTE offered 6,000,000 shares for public sale and issued 504,935 shares for exchange purposes; GTE purchased 4775 of its own shares in 1974.
 District Court Opinion, 443 F.Supp. at 523.
 
 
 [17]
 Arthur Andersen claims that no set of facts could be proven to support a finding that it had the requisite intent to defraud GTE. While it seems very unlikely that Cramer could prove that Arthur Andersen intended to defraud the corporation, we nevertheless would be reluctant to dismiss the complaint on that ground at such an early stage of the proceedings. Since we are affirming the district court's dismissal of the complaint on a separate ground, we need not decide whether it sufficiently alleged scienter on the part of Arthur Andersen
 
 
 [18]
 Nor is it fatal to Cramer's complaint that he alleges negligence in addition to scienter. While under Ernst & Ernst Cramer could not recover damages under § 10(b) for mere negligence, we conclude that the remainder of paragraph 14 of the complaint adequately alleges scienter. Since at this stage we must construe the complaint liberally, we cannot dismiss the entire complaint simply because a single allegation is insufficient under the standard of Ernst & Ernst
 
 
 [19]
 Although the Supreme Court in United Copper Securities Co. deferred to the business judgment of the directors, the Court pointed out that there was not "even an allegation that (the directors') action in refusing to bring suit (was) unwise." 244 U.S. at 264, 37 S.Ct. at 510
 
 
 [20]
 Underlying the (business judgment) rule is the assumption that Reasonable diligence Has been used in reaching the decision which the rule is invoked to justify
 Miller v. American Tel. & Tel. Co., 507 F.2d at 762 (emphasis added).
 
 
 [21]
 See Note, The Demand and Standing Requirements in Stockholder Derivative Actions, 44 U.Chi.L.Rev. 168, 196 (1976) (despite adverse business judgment, shareholder should be able to maintain a derivative action "where the corporation claim is clear, the costs of litigation are relatively small in relation to the probable recovery, and a lawsuit would not overly disrupt the commercial relation of the corporation"); note, Demand on Directors and Shareholders as a Prerequisite to a Derivative Suit, 73 Harv.L.Rev. 746, 759 (1960) ("Certainly the court must respect the board's decision if it is within the broad bounds of reason, but the noninterference doctrine should not be carried to the extreme of making an unreasonable reference of the board dispositive of the issue")
 
 
 [22]
 It should be pointed out that a stockholder may maintain an action against a corporate insider under § 16(b) of the 1934 Act, 15 U.S.C. § 78p(b), "if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter. . . ." Thus, although a derivative action under § 16(b) cannot be brought unless the shareholder has first made a demand on the directors, the directors' decision not to prosecute the suit does not preclude a subsequent action by the shareholder himself
 We also take note of the Second Circuit's recent decision in Lasker v. Burks, 567 F.2d 1208 (2d Cir. 1978), which declined to apply the business judgment rule to bar a shareholder's derivative suit against the majority directors of a registered mutual fund and its investment adviser. To permit "independent" directors to bar such a suit, the court concluded, would be "contrary to the public interests which Congress sought to protect" by enacting the Investment Company Act and the Investment Advisers Act. 567 F.2d at 1209.
 
 
 [23]
 We do not hold that a shareholder, before instituting a derivative action, must always make a demand on the directors. But we do believe that unless the plaintiff's complaint alleges some facts tending to show why a demand would be futile, such a demand should be required, and the complaint should be dismissed
 
 
 [24]
 The defendants also urge that we affirm the district court's dismissal of the complaint on the grounds: (1) that the collateral estoppel effect of the Auerbach decision bars all of Cramer's claims; and (2) that, since the plaintiff in Limmer could have brought a claim under § 10(b) and Rule 10b-5, Cramer is barred by res judicata from bringing such a claim now. Because we believe that Cramer's complaint should have been dismissed for failing to comply with the demand requirements of Rule 23.1, we need not consider these questions