692 F.2d 928
 Fed. Sec. L. Rep. P 98,865
Melvyn I. WEISS, Custodian for Gary Michael Weiss,
U/NY/UGMA, Appellant,
v.
TEMPORARY INVESTMENT FUND, INC., Provident Institutional
Management Corporation, Shearson Loeb Rhoades, Inc., Russell
W. Richie, Robert R. Fortune, James Louis Robertson, Henry
M. Watts, Jr., Dr. Ralph A. Young, Thomas S. Gates, G.
Willing Pepper, Appellees.
 No. 81-2688.
 United States Court of Appeals,
Third Circuit.
 Argued April 2, 1982.
Decided Nov. 12, 1982.
 
 Morris & Rosenthal, P.A., Wilmington, Del., Wolf Haldenstein Adler Freeman & Herz, New York City, for appellant; Daniel W. Krasner (argued), Jeffrey G. Smith, Wolf Haldenstein Adler, Freeman & Herz, New York City, of counsel.
 Peter M. Mattoon, Richard Z. Freemann, Jr. (argued), Philadelphia, Pa., for appellee, Provident Institutional Management Corp., Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., of counsel.
 David L. Foster, Paula J. Mueller, New York City, for appellee, Shearson Loeb Rhoades, Inc.; Willkie, Farr & Gallagher, New York City, of counsel.
 Morris R. Brooke, James M. Sweet, James C. Ingram, Philadelphia, Pa., for appellees, Russell W. Richie, Robert R. Fortune, James Louis Robertson, Henry M. Watts, Jr., Dr. Ralph A. Young, Thomas S. Gates and G. Willing Pepper; Drinker Biddle & Reath, Philadelphia, Pa., of counsel.
 Before GIBBONS, SLOVITER and BECKER, Circuit Judges.
 OPINION OF THE COURT
 EDWARD R. BECKER, Circuit Judge.
 
 
 1
 The principal question presented in this appeal is whether a shareholder of an investment company must make a demand on directors pursuant to Fed.R.Civ.P. 23.1 prior to commencing suit under section 36(b) of the Investment Company Act of 1940 (ICA), 15 U.S.C. Secs. 80a-35(b) (1976), to challenge the company's contracts with its investment advisers. The district judge dismissed the action for failure to satisfy the demand requirement, Weiss v. Temporary Investment Fund, Inc., 516 F.Supp. 665 (D.Del.1981), and denied the appellant leave to replead after making a demand, Weiss v. Temporary Investment Fund, Inc., 520 F.Supp. 1098 (D.Del.1981).
 
 
 2
 Appellant Weiss contends that the ICA was a product of Congress' recognition of potential conflicts of interest in the management of investment companies and that the ICA's legislative history and statutory scheme, which reflect that concern, are inconsistent with the requirement of shareholder demand. After reviewing that legislative history and statutory scheme and the purposes of the demand requirement, we perceive no such inconsistency. We conclude that the contributions of the demand requirement to corporate governance mandate application of Rule 23.1 to section 36(b) suits. We also conclude that the circumstances alleged in the complaint do not warrant excusing such a demand as futile, and the district judge did not err in denying leave to replead. We therefore affirm.I. INTRODUCTION
 
 A. Factual and Procedural Background
 
 3
 Plaintiff-appellant Melvyn I. Weiss, as custodian for his son Gary Michael Weiss, is a shareholder of the Temporary Investment Fund, Inc. (the Fund). The Fund is a no-load open-end investment company, commonly referred to as a "money market fund," whose objective is to increase the current income of its shareholders through investments in a variety of prime money market obligations. The Fund is managed by a seven-member board of directors elected by its shareholders.[1]
 
 
 4
 Under an Advisory Agreement, the management of the Fund's portfolio is entrusted to its investment adviser, Provident Institutional Management Corporation (the Adviser), a wholly-owned subsidiary of Provident National Bank (Provident). Under a sub-advisory agreement, Provident receives seventy-five percent of the Adviser's fees, in return for which it supplies, inter alia, investment research services, computer facilities, and operating personnel. Shearson Loeb Rhoades, Inc. (Shearson) serves as underwriter for the Fund and performs other administrative functions under its Administration and Distribution Agreement with the Fund.
 
 
 5
 The terms of the Advisory and Administration Agreements (collectively referred to as "advisory contracts") provide that the fees received by the Adviser and Shearson are computed as a percentage of the Fund's assets. The percentage rate is scaled downward: Shearson and the Adviser each received .175 percent of the first $300 million in assets, .15 percent of the next $300 million, and .125 percent of the third $300 million. For average net assets in excess of $900 million, the rate is fixed at .1 percent. The recent popularity of money market funds has dramatically increased the Fund's assets, to more than $2 billion when suit was commenced in 1980. This phenomenon has produced a commensurate increase in the fees received by the Adviser and Shearson.
 
 
 6
 On May 7, 1980, Weiss brought a shareholder suit on behalf of the Fund against the Adviser, Shearson, and seven directors of the Fund. One count of the complaint charges that Shearson and the Adviser breached their fiduciary duties to the Fund under section 36(b) of the ICA by receiving "excessive and unreasonable" compensation. The basis of this count is the advisory contracts, which Weiss contends permit the Adviser to receive twenty-five percent of the fees without performing any services and fail to provide for any reduction in fees after the Fund's assets exceed $900 million. Additional counts allege that all defendants breached their fiduciary duties by participating or acquiescing in the advisory contracts; that shareholder approval of the fee arrangements was secured through misleading proxy statements in violation of section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78n(a) (1976); and that the management and fee arrangements violate the Banking Act of 1933, 12 U.S.C. Secs. 24, 378(a) (1976), the ICA, and common law fiduciary duties. As relief, the plaintiff sought a judgment declaring the Advisory Agreement and the Distribution Agreement void, an order requiring that the Adviser and Shearson repay all excessive fees to the Fund, and an order requiring the individual defendants to reimburse the Fund for damages caused by their violations of the ICA and the Securities Exchange Act.
 
 
 7
 The complaint acknowledges that no demand was made on the directors of the Fund. It asserts, however, that demand is not a prerequisite for the section 36(b) count and that demand would have been futile as to all counts because the directors are controlled by the Fund's advisers and because they participated in the alleged violations. Amended Complaint at p 37.
 
 
 8
 The defendants moved to dismiss the complaint on a number of grounds, including the plaintiff's failure to satisfy the Rule 23.1 demand requirement. The district court, concluding that demand is required for a section 36(b) suit and was not excused as futile, dismissed the complaint.[2] Having determined that intra-corporate remedies should be exhausted first, the court found it unnecessary to address the other challenges to the complaint. The court subsequently denied Weiss' motion seeking leave to make a demand on the directors and to file an amended complaint if demand was refused. Weiss appeals from all three rulings.
 
 
 9
 As we indicated at the outset, section 36(b) is the principal focus of our attention. Its relevant portions are set forth in the margin.[3] Although section 36(b) does not explicitly excuse shareholders from the demand requirement of Rule 23.1, Weiss advances two theories to support his position that demand is not required. First, he argues that because the statute does not authorize a cause of action by the corporation, a section 36(b) suit is not derivative and is thus not governed by Rule 23.1 at all. Alternatively, he asserts that the legislative history and the statutory scheme supersede the policies underlying the requirement of shareholder demand. Although he presents a number of discrete arguments to support this latter thesis, their common predicate is that Congress, perceiving directors of investment companies to be ineffective checks on advisory fee levels, structured section 36(b) to permit shareholders to bypass the directors. Before considering Weiss' specific contentions, we must describe the contours of section 36(b) and other relevant provisions of the ICA.
 
 B. The Statutory Scheme
 
 10
 The management of an investment company is distinguished by its reliance on external management and investment advisers. See, e.g., Burks v. Lasker, 441 U.S. 471, 480-85, 99 S.Ct. 1831, 1838-41, 60 L.Ed.2d 404 (1979); Tannenbaum v. Zeller, 552 F.2d 402 (2d Cir.), cert. denied, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); Note, Mutual Fund Independent Directors: Putting a Leash on the Watchdogs, 47 Fordham L.Rev. 568 (1979) [hereinafter cited as Fordham Note]. Typically, an external organization such as Shearson creates the investment fund and appoints the initial board of directors. The board then enters into a contract with one or more external companies who manage the fund and provide investment services. In addition to receiving fees for these two functions (which may be performed by the same outside adviser), the independent advisers may receive underwriting fees or brokerage commissions if they also serve in those capacities. This web of financial ties among the fund and its advisers invites several conflicts of interest. In negotiating advisory fees, for example, directors affiliated with the adviser face the competing interests of the adviser, who seeks high fees, and the investors, who want low fees in order to maximize their return on investment. Similarly, an adviser who also serves as broker has an incentive to increase its fees through frequent portfolio transactions that may dissipate the earnings of the investors. See Fordham Note, supra p. 932, at 570-71.
 
 
 11
 The ICA was intended to minimize the potential conflicts arising from the creation, sale, and management of an investment company such as a mutual fund by external investment advisers. S.Rep. No. 184, 91st Cong., 1st Sess., reprinted in 1970 U.S.Code Cong. & Ad.News 4897, 4901. As originally enacted in 1940, the ICA's principal device to prevent self-dealing by the directors was the requirement that at least forty percent of the board members be independent--that is, that they have neither a direct nor an indirect financial interest in the company or its adviser. 15 U.S.C. Sec. 80a-10(a) (1976). Over time, however, it became apparent that this safeguard was insufficient to stem the burgeoning advisory fees. Recognizing that a company's dependency on its adviser limited the influence of arms-length bargaining in keeping advisory fees competitive, Congress enacted section 36(b) as part of the 1970 amendments to the ICA. That section imposes on the adviser a fiduciary duty with respect to compensation for its services and explicitly authorizes suits by the Securities and Exchange Commission and the fund's shareholders to enforce that duty. By increasing the standard of care owed by the advisers, Congress sought to ease the difficult burden faced by shareholders trying to prove that advisory contracts violated common law prohibitions against "corporate waste." See infra note 9. The remedy under 36(b) is an action against the recipient of the allegedly excessive payments for actual damages resulting from the breach of fiduciary duty, not to exceed actual payments received from the investment company. A showing of personal misconduct by the defendant is not required. The recovery of excessive fees is limited to those paid by the investment company during the one-year period prior to initiation of the suit.
 
 
 12
 Additional responsibility for monitoring management fees were also imposed on directors. The 1970 amendments require directors to investigate and evaluate advisory fee contracts, demand that a majority of disinterested directors approve the contracts, and permit the directors to terminate contracts without financial penalty upon sixty days' notice. 15 U.S.C. Sec. 80a-15(c) (1976). The amendments also tightened the qualifications of the independent directors serving on the board. Id. Secs. 80a-2(19), 80a-10(a).[4] The essence of the amendments, as the Supreme Court has noted, is to place these unaffiliated directors in the role of "independent watchdogs" charged with supervising the management of the company. Burks v. Lasker, supra, 441 U.S. at 484, 99 S.Ct. at 1840.
 
 
 13
 With this background in mind, we turn to Weiss' arguments that suits under section 36(b) are not subject to Rule 23.1.
 
 
 14
 II. IS A SECTION 36(b) ACTION DERIVATIVE?
 
 
 15
 Before addressing the arguments set forth in the briefs, we must consider a threshold contention--advanced by Weiss for the first time at oral argument--that a shareholder suit under section 36(b) is not a derivative action and thus is not subject to Rule 23.1.[5] Weiss apparently relies on the rule's requirement that the right enforced by a shareholder be one which "may properly be asserted" by the corporation.[6] The ICA, however, explicitly authorizes suits only by the SEC and by the shareholders and does not state that the Fund itself may sue its advisers for breach of fiduciary duties. If the Fund cannot sue, Weiss' theory proceeds, then a section 36(b) cause of action does not derive from a right that "may properly be asserted" by the Fund. We disagree.
 
 
 16
 We can approach this issue in several ways. One approach, adopted by the First Circuit in Grossman v. Johnson, 674 F.2d 115 (1st Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 85, 74 L.Ed.2d 80 (1982), views an investment company's right to sue its advisers as a necessary, if not explicit, corollary of the right of action conferred on shareholders by section 36(b). In holding that an investment company has a direct cause of action under section 36(b), the Grossman court stated:
 
 
 17
 We cannot believe ... that, for example, a new and independent board of directors, intent on recovering excessive fees from the investment adviser, would be precluded from suing under section 36(b). That section is explicit that recovery by a shareholder is to be on behalf of the investment company and that his suit must be brought on the same behalf. With those clear requirements, Congress could well have believed that, though it was appropriate to specify that the Commission and shareholders had the new statutory cause of action under section 36(b), see Moses v. Burgin, 445 F.2d 369, 373 n. 7 (1st Cir.1971), it was unnecessary to say with particularity that the company also did. A suit 'on behalf of such company' (a phrase which is more than merely one 'for the benefit of the company') is normally a derivative action that the company could itself bring.
 
 
 18
 Id. at 120 (footnotes omitted).[7] Along similar lines, the Supreme Court noted in Burks v. Lasker, supra, 441 U.S. at 477, 99 S.Ct. at 1836, that "[a] derivative suit is brought by shareholders to enforce a claim on behalf of the corporation" (emphasis supplied), and the Court thereafter referred without comment to a section 36(b) suit as derivative, id. at 484, 99 S.Ct. at 1840.
 
 
 19
 We agree with the First Circuit's reasoning as far as it goes, but we expand our analysis to consider the test enunciated in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Cort provides the generally accepted framework for determining whether a statute creates an implied right of action.[8] Our application of the Cort test leads us to the same conclusion as the First Circuit.
 
 
 20
 Cort counsels consideration of four factors:
 
 
 21
 First, is the plaintiff 'one of the class for whose especial benefit the statute was enacted,'--that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law.
 
 
 22
 Cort v. Ash, supra, 422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted). With respect to the first factor, we have no difficulty in concluding that an investment company is the intended beneficiary of section 36(b). The legislative history states that the fiduciary duty imposed on advisers, one of the major innovations of the statute, is owed to the company itself. S.Rep.No. 184, 91st Cong., 1st Sess., reprinted in 1970 U.S.Code Cong. & Ad.News 4897, 4902. Moreover, as Weiss concedes, any recovery obtained in a shareholder suit reverts to the investment company and not to the plaintiff.
 
 
 23
 The second factor, ascertainment of Congress' intent, is the principal focus of the Cort inquiry. Merrill Lynch, Pierce, Fenner & Smith v. Curran, --- U.S. ----, 102 S.Ct. 1825, 1839, 72 L.Ed.2d 182 (1982); see Walck v. American Stock Exchange, Inc., 687 F.2d 778, at 781, 783 (3d Cir.1982). We find nothing in the legislative history of the ICA that suggests an intent to deprive the company of a direct remedy. Neither, we must concede, do we find an explicit expression by Congress that the investment company is authorized to sue its adviser. But our conclusion is unaffected by this absence of express authorization for, as the Supreme Court noted in canvassing the same legislative history, silence regarding the powers of the board of directors is to be expected: "The ICA does not purport to be the source of authority for managerial power; rather, the Act functions primarily to 'impos[e] controls and restrictions on the internal management of investment companies.' " Burks v. Lasker, supra, 441 U.S. at 478, 99 S.Ct. at 1837 (citation omitted) (emphasis in original). Thus we may properly infer from this legislative silence that Congress did not intend to restrict the company's right to sue.
 
 
 24
 The state of the law at the time of the 1970 amendments supports this construction of the legislative history. We are required to look at this "contemporary legal context" to determine whether the company had a right to sue when the statute was enacted. If such a right existed, we need only determine whether Congress intended to preserve the preexisting remedy. See Merrill Lynch, Pierce, Fenner & Smith v. Curran, supra, 102 S.Ct. at 1839. In this regard, we agree with the district court's observation, see 516 F.Supp. at 670 n. 11, that the company possessed (and still possesses) a cause of action against the adviser at common law.[9] We also note that a shareholder's right to sue derivatively was implied by former section 36 (now section 36(a)), which authorizes SEC enforcement of the ICA's regulatory scheme. See, e.g., Moses v. Burgin, 445 F.2d 369 (1st Cir.1971) (finding implied right of action under former section 36 for shareholder to sue derivatively to recapture excessive brokerage fees paid by the mutual fund). "Where Congress adopts a new law incorporating sections of a prior law, Congress can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute." Merrill Lynch, Pierce, Fenner & Smith v. Curran, supra, 102 S.Ct. at 1841 n. 66. Against this legal backdrop at the time of the amendments, Congress' assumption that the shareholder suit was derivative from the company's right of action becomes clear, as does the correctness of the First Circuit's conclusion that Congress assumed the company enjoyed a direct cause of action and there was no need to so specify. In sum, the second Cort criterion is met for the reasons set forth by the First Circuit in Grossman and because we find no evidence of a Congressional intent to deprive the company of its right to sue the company's adviser.
 
 
 25
 The third and fourth factors of the Cort test follow ineluctably from the preceding discussion. Providing the investment company with a cause of action fully accords with the purposes of section 36(b) by providing another means to recover excessive advisory fees. From a practical standpoint, in fact, the company's financial resources and knowledge of the challenged transactions may render it an even more effective litigant than the shareholder. Finally, the express cause of action conferred by Congress upon shareholders ipso facto federalizes this type of litigation; hence implication of a companion remedy for the investment company does not intrude upon an area "traditionally relegated to state law." Thus application of the four-pronged test of Cort v. Ash compels us to conclude that the investment company has a cause of action against the advisers for breach of the fiduciary duties imposed by section 36(b). We are aware that the Court of Appeals for the Second Circuit recently reached the opposite conclusion. Fox v. Reich & Tang, Inc., 692 F.2d 250 (2d Cir.1982). After careful consideration of the court's reasoning, however, we remain convinced that the investment company has a cause of action and that a Sec. 36(b) action is derivative.
 
 
 26
 III. IS SECTION 36(b) CONSISTENT WITH THE DEMAND REQUIREMENT?
 
 
 27
 Even if a section 36(b) suit is derivative, Weiss insists that the ICA excuses such suits from the Rule 23.1 demand requirement. As we have noted, he concedes that the statute does not do so expressly, but contends that the legislative history and statutory scheme of section 36(b) manifest Congress' intent to eliminate this prerequisite to suit.
 
 
 28
 At the outset we note that Weiss must overcome the presumption that Rule 23.1, like all Federal Rules of Civil Procedure, applies to any civil suit brought in federal district court unless inconsistent with an Act of Congress. Fed.R.Civ.P. 1; see 28 U.S.C. Sec. 2072 (1976). Abrogation of a rule of procedure generally is inappropriate "[i]n the absence of a direct expression by Congress of its intent to depart from the usual course of trying 'all suits of a civil nature' under the Rules established for that purpose." Califano v. Yamasaki, 442 U.S. 682, 683, 700, 99 S.Ct. 2545, 2548, 2557, 61 L.Ed.2d 176 (1979). Repugnancy of a statute to a civil rule is not to be lightly implied. Rather, "a subsequently enacted statute should be so construed as to harmonize with the Federal Rules if that is at all feasible." Grossman v. Johnson, supra, 674 F.2d at 122-23 (quoting 7 Moore's Federal Practice p 86.04 at 86-22 (2d ed. 1980)); accord Fox v. Reich & Tang, Inc., 94 F.R.D. 94 (S.D.N.Y.1982), rev'd on other grounds, 692 F.2d 250 (2d Cir.1982).
 
 
 29
 A. Does the Legislative History Reflect Congress' Intent to Require Demand?
 
 
 30
 Weiss relies first on the legislative history accompanying the 1970 amendments, passages of which reflect Congress' perception that even unaffiliated directors had not been able to secure changes in the advisory fee levels. For example, he quotes from the Securities and Exchange Commission Report on Investment Companies, H.R.Rep. No. 2337, 89th Cong., 2d Sess. (1966):
 
 
 31
 It has been the Commission's experience in the administration of the Act that in general the unaffiliated directors have not been in a position to secure changes in the level of advisory fee rates in the mutual fund industry.
 
 
 32
 * * *
 
 
 33
 The analysis of the shareholder fee litigation not only underscores the need for changes in existing statutory provisions relating to management compensation in the investment company industry, but points to the direction which these changes should take. It makes clear the need to incorporate into the Act a clearly expressed and readily enforceable standard that would measure the fairness of compensation paid by investment companies for services furnished by those who occupy a fiduciary relationship to such companies.
 
 
 34
 * * *
 
 
 35
 The right of the Commission as well as investment company shareholders to take action against violations of the statutory standard of reasonableness is essential to effective enforcement.
 
 
 36
 Id. at 131, 143, 146 (emphasis supplied by appellant). Second, he invokes the Congressional intention to establish a mechanism by which the shareholders and courts could enforce the investment adviser's fiduciary duty. The report accompanying the 1970 amendments states:
 
 
 37
 In the case of management fees, the committee believes that the unique structure of mutual funds has made it difficult for the courts to apply traditional fiduciary standards in considering questions concerning management fees.
 
 
 38
 Therefore your committee has adopted the basic principle that, in view of the potential conflicts of interest involved in the setting of these fees, there should be effective means for the court to act where mutual fund shareholders or the SEC believe there has been a breach of fiduciary duty.
 
 
 39
 S.Rep. No. 184, 91st Cong., 1st Sess., reprinted in 1970 U.S.Code Cong. & Ad.News 4897, 4898 (emphasis supplied by appellant).
 
 
 40
 These passages do not reflect a "direct expression by Congress" of its intent to eliminate the demand requirement. Expressions that shareholders and the SEC need increased judicial access in order to insure the reasonableness of advisory fees do not denote an intent to bypass the directors completely. On the contrary, the legislative history is replete with references to Congress' intent to preserve, not preempt, the role of management in negotiating advisory fees. The Senate Report emphasizes this point:
 
 
 41
 [Section 36(b) ] is not intended to authorize a court to substitute its business judgment for that of the mutual fund's board of directors in the area of management fees.... Indeed, this section is designed to strengthen the ability of the unaffiliated directors to deal with these matters and to provide a means by which the Federal courts can effectively enforce the federally-created fiduciary duty with respect to management compensation. The section is not intended to shift the responsibility for managing an investment company in the best interest of its shareholders from the directors of such company to the judiciary.
 
 
 42
 S.Rep.No. 184, 91st Cong., 1st Sess., reprinted in 1970 U.S.Code Cong. & Ad.News 4897, 4902-03. The clear intent of Congress was to install management as "the first line of defense for the individual investor" against any self-dealing by the adviser. Fox v. Reich & Tang, Inc., supra, 94 F.R.D. at 96. As the Supreme Court noted in Burks v. Lasker, supra, 441 U.S. at 484-85, 99 S.Ct. at 1840, the 1970 amendments were designed to place the unaffiliated directors in a "watchdog" role. Requiring that shareholders make a demand upon the directors is fully consonant with this purpose.
 
 
 43
 Requiring demand also accords with the legislative history, which itself alludes to the continued operation of the demand requirement. During Congressional hearings on the proposed amendments to the ICA, then SEC Chairman Hamer Budge assured the committee that providing shareholders with a cause of action would not encourage nuisance suits: "As we have pointed out previously, there are adequate safeguards under the Federal Rules of Civil Procedures [sic] and under this bill to prevent unjustified shareholder litigation." Hearings on H.R. 11995, S. 2224, H.R. 13754 and H.R. 14737 Before the Subcomm. of Commerce and Finance of the House Comm. on Interstate and Foreign Commerce, 91st Cong., 1st Sess. 201 (1969); accord id. at 860. It is clear to us that this statement refers to Rule 23.1 and its demand requirement. Contrary to Weiss' suggestion, the legislative history reflects an implicit understanding that Rule 23.1 would apply--an understanding which comports with the purposes of section 36(b).
 
 
 44
 B. Is the Statutory Scheme Consistent with the Requirement of Shareholder Demand?
 
 
 45
 Weiss' final arguments regarding the alleged inapplicability of Rule 23.1 spring from his contention that the structure of section 36(b) is inconsistent with the requirement of shareholder demand, and that Congress therefore did not contemplate demand as a prerequisite to suit. Weiss makes three arguments. The first two require only brief discussion; the third merits more extensive treatment.
 
 
 46
 1. The Effect of the One-Year Limitation on Recovery
 
 
 47
 Weiss asserts that demand cannot be required because: (1) section 36(b) limits the recovery of unreasonable fees to those that were paid during the one-year period prior to commencement of suit; (2) once a shareholder plaintiff makes a demand, the directors can delay a response while the excessive fees continue to be paid; and (3) Congress could not have intended to interpose the demand requirement because the time consumed by the directors in responding to demand would time-bar claims to recover fees paid out by the investment fund. At least one court has identified this statutory provision as a basis for suggesting, in dictum, that demand should not be a prerequisite to a section 36(b) suit. See Blatt v. Dean Witter Reynolds Intercapital, Inc., 528 F.Supp. 1152, 1155 (S.D.N.Y.1982).
 
 
 48
 We recognize that in some cases, demand will postpone the filing of suit and thereby move forward the one-year period allowed for the recovery of fees. In most instances, however, this will not reduce the allowable recovery. In any event, we do not see why demand cannot be promptly made and expeditiously considered.[10] Notwithstanding Weiss' intimations to the contrary, demand is a simple procedure that is not burdensome to the shareholders. We therefore do not believe that the one-year limitation period compels the conclusion that Congress intended to eliminate the demand requirement.[11]
 
 
 49
 2. The Analogy to Section 16(b) of the Securities Exchange Act of 1934
 
 
 50
 Weiss advances a somewhat tortured analogy between section 36(b) of the ICA and section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78p(b) (1976), which allows shareholders to recover illegal insider "short swing" profits. Suits brought under section 16(b) are exempt from the contemporaneous ownership requirement of Rule 23.1. Blau v. Mission Corp., 212 F.2d 77, 79 (2d Cir.), cert. denied, 347 U.S. 1016, 74 S.Ct. 872, 98 L.Ed. 1138 (1954). Weiss perceives similarities between insider trading and "insider" advisory fees. He suggests that section 36(b), like section 16(b), is an instrument of public policy which should not be hampered by procedural restrictions such as the demand requirement of Rule 23.1.
 
 
 51
 Without reaching the merits of the statutory analogy, we simply note that it is irrelevant: suits to recover short swing profits under section 16(b) are subject to the demand requirement by the very terms of that statute, which states that a shareholder may institute an action "if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter." 15 U.S.C. Sec. 78p(b) (1976). We therefore join the First Circuit in rejecting this argument as specious. See Grossman v. Johnson, supra, 674 F.2d at 120.
 
 
 52
 3. The Relationship Between Shareholder Demand and the Exercise of the Directors' Business Judgment
 
 
 53
 The heart of Weiss' challenge based on the statutory scheme is his assertion that shareholder demand is superfluous because that scheme effectively precludes the Fund's directors from taking action in response to any such demand. The premise of his argument is the Supreme Court's suggestion that the ICA deprives the directors of their authority to exercise their business judgment to terminate a section 36(b) suit. In Burks v. Lasker, supra, the Court stated:
 
 
 54
 when Congress ... intended to prevent board action from cutting off derivative suits, it said so expressly. Section 36(b) ... performs precisely this function for derivative suits charging breach of fiduciary duty with respect to adviser's fees.
 
 
 55
 441 U.S. at 484, 99 S.Ct. at 1840. Although section 36(b) was not directly at issue in Burks, the Court's interpretation of that section influenced its holding that other sections of the ICA do not deprive directors of their authority to terminate derivative suits under the shield of the business judgment rule. Prudence dictates that we accede to this strong signal from the Court that directors may not terminate suits under section 36(b), notwithstanding our perception that the statement's import is unclear. See supra pp. 938-939.
 
 
 56
 Weiss then argues that if a suit's termination is precluded, it would be inconsistent to require demand as a prerequisite to initiation: if directors are too self-interested to be allowed to cut off shareholder suits in the exercise of their business judgment, they must be presumed to be too self-interested to respond objectively to a shareholder demand. Relying in part upon our observation in Cramer v. General Telephone and Electronics Corp., 582 F.2d 259, 274 (3d Cir.1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979), that the business judgment rule is "inextricably linked" to the demand requirement, Weiss essentially concludes that the Court's inclination to disregard business judgment in this context makes the demand requirement superfluous and inefficient.
 
 
 57
 Our opinion in Lewis v. Curtis, 671 F.2d 779 (1982), lends some credence to Weiss' position.[12] Lewis involved a shareholder complaint alleging that demand would have been futile because the directors had participated in an allegedly self-interested transaction.[13] In evaluating this claim, we stated that the futility of demand turns on the disinterestedness of the directors, not on the nature of the alleged wrongdoing. We also noted that the relevant standard of disinterestedness is the same as that used to determine whether a court should defer to the board's business judgment not to pursue a lawsuit on behalf of the corporation.
 
 
 58
 There is no reason why a court, in deciding whether a board is sufficiently interested to excuse demand, should not be informed by the same factors used to determine whether a court should defer to the board's decision not to pursue the action. The board will lack such disinterestedness if plaintiff's allegations, taken as true, would show that, under state law, a court should not defer to the board's decision not to pursue the lawsuit....
 
 
 59
 Some courts have suggested that directors may not be sufficiently interested in a transaction to excuse demand, yet are interested enough to be unable to assert the protection of the business judgment rule.... On the other hand, formulating different standards for the two issues is ... difficult.... [W]e do not think that we should apply different standards of "interestedness" to cases in which plaintiff has made no demand and to those in which a demand has been made and rejected.
 
 
 60
 Id. at 785-86 (citations omitted). Since (according to Weiss' argument) directors are too self-interested to terminate shareholder suits, the logical extension of Lewis would be to say that they are so interested that demand should be excused in this case as a matter of law.
 
 
 61
 Although Weiss' argument is superficially alluring, we find it ultimately unpersuasive. First, to the extent that it is based on Burks, see supra pp. 937-938, the argument rests on rather uncertain footing. Weiss would read Burks as standing for the proposition that directors may not terminate shareholder suits because directors are too interested in advisory fee transactions. While this is not an implausible reading of Burks, we do not find the Supreme Court's rationale so easy to discern. Section 36(b)(2) accords the advisory fee actions of directors only "such consideration by the Court as is deemed appropriate under the circumstances." Burks understandably concluded that Congress intended less judicial deference to directors' actions regarding advisory fees than is ordinarily associated with the business judgment rule. But we are unable to divine from that opinion a per se rule that investment company directors are presumed to be self-interested, and we decline to adopt Weiss' suggested rule on such a speculative basis.
 
 
 62
 Weiss also reads too much into our statement in Cramer, supra, that the demand requirement and the business judgment rule are "inextricably linked." 582 F.2d at 274. Rather, as the district court noted below, see 516 F.Supp. at 670 n. 13, the policies underlying each doctrine are distinct.
 
 
 63
 The demand requirement originated as a judicially-created device that forced shareholders to exhaust intracorporate remedies before beginning suit. As explained in one of the earliest expositions of the principle:
 
 
 64
 [I]t is ... important that before the shareholder is permitted in his own name to institute and conduct a litigation which usually belongs to the corporation, he should show to the satisfaction of the court that he has exhausted all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity to his wishes. He must make an earnest, not a simulated effort, with the managing body of the corporation, to induce remedial action on their part.
 
 
 65
 Hawes v. Oakland, 104 U.S. 450, 460-61, 26 L.Ed. 827 (1882).[14] The requirement reflects judicial cognizance of the prerogatives and expertise of the directors as stewards of the corporate welfare. One commentator summarized this purpose as follows:
 
 
 66
 Forcing shareholders to exhaust intracorporate remedies by first making demand on directors allows the directors a chance to occupy their usual status as managers of the corporation's affairs, giving the corporation an opportunity to take control of a suit that will be brought on its behalf. The demand requirement thus furthers a principle basic to corporate organization, that the management of the corporation be entrusted to its board of directors.
 
 
 67
 Note, The Demand and Standing Requirements in Stockholder Derivative Actions, 44 U.Chi.L.Rev. 168, 171 (1976). When faced with a demand by a shareholder, the directors have a number of options. They can exercise their discretion to accept the demand and prosecute the action, to resolve the grievance internally without resort to litigation, or to refuse the demand. It is at this point that the business judgment rule comes into play.
 
 
 68
 The business judgment rule eludes precise categorization, as it assumes different shapes in different settings. See Duesenberg, The Business Judgment Rule and Shareholder Derivative Suits: A View from the Inside, 60 Wash.U.L.Q. 311 (1982). In its traditional form, the rule protects directors from personal liability for business decisions by presuming that they acted in good faith and with reasonable care. See Johnson v. Trueblood, 629 F.2d 287, 292 (3d Cir.1980) (even in a facially self-dealing transaction, the rule assumes directors were "exercising their sound business judgment rather than responding to any personal motivations"), cert. denied, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981). In shielding directors from the hazards of hindsight challenges to the wisdom of particular decisions, the rule serves two important functions.
 
 
 69
 Were courts, with perfect retrospective vision, to second-guess the judgment of officers and directors in their decisionmaking function, they would be injecting themselves into a management role for which they were neither trained nor competent. Such judicial action would also be taking a step to discourage others from performing these desired and essential societal activities. One pragmatic objective of the business judgment rule, then, is to keep courts out of a role they are ill-equipped to perform. Another is to encourage others to assume entrepreneurial and risk-taking activities by protecting them against personal liability when they have performed in good faith and with due care, however unfortunate the consequence. Both are of monumental social utility.
 
 
 70
 Duesenberg, supra, 60 Wash.U.L.Q. at 314 (footnotes omitted).
 
 
 71
 Because the considerations involved in imposing the demand requirement and invoking the business judgment rule are distinct, their applicability is not necessarily coincidental. In fact, this Court so noted in Cramer: "[W]hile the demand requirement of Rule 23.1 should be rigorously enforced, we do not think that the business judgment of the directors should be totally insulated from judicial review."[15] The American Law Institute recently expressed a similar view in its proposed Restatement on Principles of Corporate Governance and Structure Sec. 7.02, at 270-71 (Tent. Draft No. 1, 1982):
 
 
 72
 It is not inconsistent for a court to employ a strict standard with respect to the excusal of demand, but then to refuse to accept a decision by the same board of directors to seek termination of the same action.... As some decisions have emphasized, the focus at the demand stage should be on the issue of whether the corporation may take over the suit and either prosecute it or adopt other internal corrective measures, and not on the later question of whether a decision not to sue should be respected by the court. At the demand stage, the possibility should not be foreclosed that a demand will induce the board to consider issues and crystallize policies which otherwise might not be given attention (e.g., new accounting controls, revised corporate policy statements or even a change in personnel or remuneration). The demand rule can have efficacy even where the board ultimately rejects the action and the court ultimately permits the plaintiff to sue.
 
 
 73
 In particular, as we noted in Cramer, the demand requirement gives management the opportunity to pursue alternative remedies and to avoid unnecessary litigation. 582 F.2d at 275.
 
 
 74
 We find the distinction particularly important here in light of Congress' clear intent to enhance the independence of directors and their responsibility for advisory fees. The ICA and its amendments were designed to erase potential conflicts of interest inherent in the structure of investment companies by placing the unaffiliated directors in a substantial management role and providing them with authority to act as checks on advisory fees. Congress explicitly empowered the directors to redress challenges to advisory fees by imposing on directors a duty to evaluate the advisory fees and by authorizing them to terminate investment adviser contracts without penalty upon the giving of sixty days notice. 15 U.S.C. Sec. 80a-15(a)(3) (1976).[16] To allow shareholders to bypass the directors would undermine the role shaped for directors by the ICA. The opportunity to resolve the shareholder grievance without resort to litigation may, in fact, be especially important if the directors are not able to terminate the suit. In that event the Rule 23.1 demand provides the only opportunity for the Fund to avert a lawsuit through internal corrective measures.[17]
 
 
 75
 Finally, the different purposes served by the business judgment rule and the demand requirement show that the wooden transposition of Lewis to this statutory context is inappropriate. Lewis was concerned with the futility of demand. It involved an inquiry which is "intensely factual" and requires particularized pleading by the plaintiff. See Vernars v. Young, 539 F.2d 966, 968 (3d Cir.1976). In a conventional shareholder suit, the evaluation of the directors' decision to refuse demand or terminate suit is equally factual, and it makes sense, as we stated in Lewis, to employ the same standard of interestedness. However, a statutory presumption of interestedness cannot substitute for the factual inquiry needed to determine whether a demand on directors "would be likely to prod them to correct a wrong." Lewis, supra, 671 F.2d at 785.[18]
 
 
 76
 In sum, to read the ICA's statutory scheme as depriving directors of the opportunity to respond to a shareholder grievance would undermine the very purpose of the ICA--to strengthen management of the Fund by its independent directors. We attribute no such inconsistent intent to the Congress and conclude that the demand requirement of Rule 23.1 applies to section 36(b) actions.[19]
 
 IV. THE ALLEGED FUTILITY OF DEMAND
 
 77
 Weiss contends that even if his section 36(b) claim is subject to the Rule 23.1 demand requirement, such demand would have been futile for all counts of his complaint. The complaint alleges that demand is unnecessary because (1) Shearson and the Adviser control and dominate the Fund and its directors; (2) all of the Fund's directors have participated or acquiesced in the Adviser's breach of fiduciary duty; and (3) the hostility of the directors to the claim was evidenced by the filing of an answer to the initial complaint. Amended Complaint at p 37.
 
 
 78
 The district court found that the allegations of the Adviser's and Shearson's control over the directors were inadequate to excuse demand: Weiss failed to provide proof sufficient to overcome the fact that four of the six directors who approved the transaction were not "interested" under the terms of the ICA, 15 U.S.C. Sec. 80a-2(a)(19) (1976). The district court also rejected Weiss' effort to use the company's answer to the complaint as evidence of the directors' hostility to suit. Applying the edict of this Court that futility "must be gauged at the time the derivative action is commenced, not afterward with the benefit of hindsight," see Cramer v. General Telephone & Electronics Corp., supra, 582 F.2d at 276, the district court concluded that opposition expressed after suit was filed could not excuse demand.
 
 
 79
 Finally, the court turned to the allegation that the directors' participation in the transaction made demand unnecessary. The court first noted that simply naming the directors as defendants cannot automatically excuse demand on the theory that they would have to decide whether to sue themselves.[20] The court then applied the test enunciated in In re Kauffman Mutual Fund Actions, 479 F.2d 257 (1st Cir.), cert. denied, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 107 (1973), which states that mere approval of the challenged transaction is insufficient to demonstrate futility of demand unless the complaint alleges facts showing that the transaction was motivated by self-interest or bias. The Court found that Weiss' complaint failed to allege that the directors stood to gain any personal advantage from approval of the advisory contracts; rather, it challenged the directors' action only as a breach of their statutory and common law fiduciary duties. The court accordingly ruled that the pleadings failed to assert a basis for excusing demand.[21] We agree with the analysis of the district court that these allegations are insufficient to excuse demand and affirm on that basis.
 
 
 80
 V. DENIAL OF WEISS' MOTION TO REPLEAD AFTER MAKING DEMAND
 
 
 81
 Finally, Weiss contends that the district court abused its discretion in refusing him leave to replead after a demand on the Fund's directors. He relies principally on Markowitz v. Brody, 90 F.R.D. 542 (S.D.N.Y.1981), in which the court stayed dismissal for ninety days in order to allow plaintiff the opportunity to make a demand.
 
 
 82
 We reject this contention as well. The law of this circuit makes clear that demand after a complaint has been filed is impermissible since it would "reduce the demand requirement of the rule to a meaningless formality." Schlensky v. Dorsey, 574 F.2d 131 (3d Cir.1978). We recognize that application of this rule in this context may seem costly given the Act's limitation on recovery to the excessive fees received during the year immediately prior to the filing of suit. Nevertheless, requiring demand before the filing of suit affords directors "the opportunity to decide in the first instance whether and in what manner action should be taken." Id. A demand after suit is filed would usurp this prerogative.
 
 
 83
 The district court's judgment dismissing the complaint will be affirmed.
 
 
 84
 GIBBONS, Circuit Judge, dissenting.
 
 
 85
 This is an appeal from a judgment dismissing a multi-count complaint by a shareholder of a money market fund for failure to comply with the demand requirement of Rule 23.1 of the Federal Rules of Civil Procedure.[1] I agree with the majority that the district court properly dismissed all causes of action pleaded in the complaint except that based upon section 36(b) of the Investment Company Act of 1940[2] (ICA). As to that claim I would reverse.
 
 I.
 
 86
 Plaintiff Melvyn I. Weiss, custodian for his son, Gary M. Weiss, is a shareholder of the Temporary Investment Fund, Inc. (Fund), a no-load, open end, diversified investment company, or "money market fund." In 1980, Weiss brought a shareholder's derivative suit against the Fund, the Provident Institutional Management Corp. (Provident), which acts as the Fund's investment adviser, Shearson Loeb Rhoades, Inc. (Shearson), the Fund's underwriter which also performs administrative duties for the Fund, and seven directors of the Fund. Weiss alleges that Provident and Shearson breached their fiduciary duties under section 36(b) of the ICA by receiving excessive and unreasonable compensation for management services. Weiss further alleges that the various defendants participated in or acquiesced in various breaches of fiduciary obligations owed the Fund and in violations of the Securities Exchange Act of 1934,[3] the Banking Act of 1933,[4] the ICA[5] and the common law. The complaint acknowledges that no demand was made on the directors of the Fund to bring a similar action but alleges that such a demand would be futile. The district court, however, concluded that the plaintiff's failure to make such a demand pursuant to Rule 23.1 was fatal to the action, and dismissed it.[6] Subsequently, Weiss filed a motion for reargument requesting that the court grant him leave to file an amended complaint after making a demand on the directors. He also asked the court to reconsider its determination of non-compliance with Rule 23.1. The district court refused to reconsider, or to grant leave to make a demand.
 
 II.
 
 87
 Rule 23.1 of the Federal Rules of Civil Procedure specifies several pleading requirements "[i]n a derivative action brought by one or more shareholders or members to enforce a right of a corporation or of an unincorporated association, the corporation or association having failed to enforce a right which may properly be asserted by it ..." Fed.R.Civ.P. 23.1. Among those requirements is that of pleading that a demand has been made on the directors to enforce a right which the corporation may properly assert.[7] Rule 23.1 finds its genesis in Equity Rule 94, 104 U.S. IX (Jan. 23, 1882), which adopted as an Equity Rule the Supreme Court's holding in Hawes v. Oakland, 104 U.S. 450, 26 L.Ed. 827 (1881).[8] The Court in Hawes stated that
 
 
 88
 before the shareholder is permitted in his own name to institute and conduct a litigation which usually belongs to the corporation, he should show to the satisfaction of the court that he has exhausted all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity to his wishes. He must make an earnest, not a simulated effort, with the managing body of the corporation, to induce remedial action on their part, and this must be made apparent to the court.
 
 
 89
 104 U.S. at 460-61. This judicially-created demand requirement has survived with slight modification in Rule 23.1. Hawes was decided, and Equity Rule 94 was promulgated, during the regime of Swift v. Tyson, 41 U.S. (1 Pet.) 1, 10 L.Ed. 865 (1842), when federal courts were free to establish their own equitable remedial jurisprudence. See Judiciary Act of 1789, ch. 20, Sec. 11, 1 Stat. 926; Process Act of May 8, 1792, ch. 36, Sec. 2, 1 Stat. 276 (1850). There was, therefore, no need to decide whether Equity Rule 94, with its demand requirement, was substantive law or merely a procedural provision.
 
 
 90
 Two developments changed that indifference. One was the 1938 merger of law and equity. The other was the Supreme Court's decision in Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), applying the Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), choice of law to prevent the application of a federal equitable remedial rule in a diversity case. In light of that holding, the procedural or substantive character of the demand requirement of Rule 23.1 becomes important.
 
 
 91
 It is clear that Congress did not deal with the Erie choice of law question with respect to Rule 23.1. The Federal Rules of Civil Procedure were promulgated by the Supreme Court on December 20, 1937 and reported to Congress on January 3, 1938. Erie v. Tompkins was argued to the Court on January 31, 1938, and was decided in April 1938. Congress adjourned on June 16, 1938 and the Rules took effect September 16, 1938. That chronology of events makes it highly unlikely that Congress examined the remedial versus procedural aspects of the demand clause in Rule 23.1. The origins of Rule 23.1 are of little help, since, as indicated above, the question in 1882 of whether Rule 23.1 was procedural or substantive need not have been asked. We are left, therefore, with the task of construing a Federal Rule of Civil Procedure in such a manner as to ensure its validity in actions involving state law claims. See, e.g., Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965).
 
 
 92
 This court has held that a plaintiff-shareholder's obligation to make a demand on the corporate directors before pursuing a derivative claim is inextricably linked to the state law business judgment rule. Cramer v. GTE Corp., 582 F.2d 259, 274 (3d Cir.1978), cert. denied, 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979). "Once the shareholder has made a demand upon the directors, the directors are then able to determine whether in their opinion a suit on behalf of the corporation would comport with the best interests of the corporation." Id. at 275. The directors can pursue remedies alternative to litigation, can terminate meritless causes of action, and can determine whether litigation cost and other adverse effects on business relationships with potential defendants would outweigh any potential recovery from the lawsuit. The directors' decision to allow suit or not is insulated from judicial review by the business judgment rule. The rule is a substantive one, intended to enforce the elected management's responsibility for operating the corporation, while insulating it from liability for good faith mistakes made while performing its duties. See Briggs v. Spaulding, 141 U.S. 132, 146-148, 11 S.Ct. 924, 928-29, 35 L.Ed. 662 (1891).
 
 
 93
 Subsequent to our decision in Cramer v. GTE Corp., 582 F.2d 259, the Supreme Court had occasion to make explicit what was implicit in the Cramer discussion; that the substantive business judgment rule is a rule of state, not federal law. In Burks v. Lasker, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), the Court considered whether state or federal law governs the power of a corporation's directors to terminate a derivative suit, and ruled:
 
 
 94
 We hold today that federal courts should apply state law governing the authority of independent directors to discontinue derivative suits to the extent such law is consistent with the policies of the [federal statutes relied upon].
 
 
 95
 Id. at 486, 99 S.Ct. at 1841.
 
 
 96
 It is clear, then, that the business judgment rule which Rule 23.1 enforces is not a product of federal substantive law. If the rule is to be considered valid under Erie, it must now be regarded as the procedural means whereby federal courts ensure that the underlying substantive state law business judgment rule is implemented. The Rule 23.1 demand requirement is, therefore, a procedural device that since Erie is animated by the existence of an underlying substantive content. As a necessary corollary, if it is determined that for a given cause of action the directors do not have the substantive power under the relevant law to prevent or to terminate the derivative action, then the demand requirement of Rule 23.1 is not activated since its application would serve no meaningful purpose. A fortiori, if the cause of action is one which the corporation could not bring on its own behalf, Rule 23.1 cannot apply. This is plain from the text of the rule, and would be required as a matter of choice of law in any event.
 
 
 97
 The issue, thus, is the choice of law to be made in determining whether the underlying cause of action admits to the application of a state law business judgment rule which a Rule 23.1 demand would effectuate. In diversity cases or for pendent state law claims, the relevant substantive law is constitutionally mandated to be state law and, hence, a Rule 23.1 demand requirement is always triggered by the state business judgment rule. In non-diversity cases, Erie is of no relevance with respect to the elements of the cause of action. Yet as the Supreme Court makes clear in Burks v. Lasker, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404, federal courts ordinarily look to state corporate law for the existence of an applicable business judgment rule. The federal courts' adoption of state corporate law when deciding the scope of the corporate directors' powers to terminate or to prevent derivative suits is merely a rule of statutory construction. It is based on a judicial determination that Congress in creating federal causes of action does so against a background of state corporate law to which federal courts must refer even though the cause of action is based on federal law. See Burks v. Lasker, 441 U.S. at 478-79, 99 S.Ct. at 1837; see also Johnson v. Railway Express Agency, 421 U.S. 454, 465, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975). That general proposition is qualified, however, by the requirement that the state may not contravene the policies of the federal law with respect to which the business judgment question arises. See, e.g., Burks v. Lasker, 441 U.S. at 478-79, 99 S.Ct. at 1837. The demand requirement under Rule 23.1 is applicable even to federal causes of action because the state law business judgment rule applies unless the relevant federal law preempts exercise of business judgment. A demand is required only if the corporation may assert the cause of action relied upon, and the substantive law giving rise to the cause of action permits the directors to terminate it in the exercise of their business judgment.
 
 III.
 
 98
 For all causes of action asserted by Weiss except that under section 36(b) of the ICA, a demand is required because they depend on state law, or on non-preemptive federal law, and the directors may exercise business judgment to take over or to terminate the claim. Of course, the business judgment rule is inapplicable, as a matter of state law, where the directors' judgment is not in good faith, is the product of self-dealing or is made under the influence of persons suspected of wrongdoing. Moreover, the directors' discretion is not unbounded, and courts may examine their action to determine whether it is within the permissible bounds of that discretion.
 
 
 99
 Weiss urges that for all counts a demand on the Fund directors should be excused as futile. Like the majority, I am unconvinced. We previously stated that:
 
 
 100
 The Supreme Court and, following it, the Courts of Appeals have repeatedly stated and applied the doctrine that a stockholder's derivative action, whether involving corporate refusal to bring anti-trust suits or some other controversial decision concerning the conduct of corporate affairs, can be maintained only if the stockholder shall allege and prove that the directors of the corporation are personally involved or interested in the alleged wrongdoing in a way calculated to impair their exercise of business judgment on behalf of the corporation, or that their refusal to sue reflects bad faith or breach of trust in some other way.
 
 
 101
 Landy v. FDIC, 486 F.2d 139, 149 (3d Cir.1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), quoting Ash v. International Business Machines, Inc., 353 F.2d 491, 493 (3d Cir.1965), cert. denied, 384 U.S. 927, 86 S.Ct. 1446, 16 L.Ed.2d 531 (1966). Weiss' allegations do not, however, state with particularity reasons why the directors would not be able properly to make the choice whether to sue. "Instead of being 'a statement of appropriate and convincing facts' that a demand would have been futile, [plaintiff's allegations constitute] merely a vague, conclusory statement." Landy v. FDIC, 486 F.2d at 148 (citation omitted). Thus I agree that the district court did not err in dismissing those state law and federal law claims as to which the state law business judgment rule clearly applies.
 
 IV.
 
 102
 Whether Rule 23.1 applies to a claim asserted under section 36(b) of the ICA depends on (1) whether such a claim is one belonging to the corporation, and (2) if it is, whether it is one as to which the state law business judgment rule may as a matter of federal substantive law apply. Section 36(b) is part of a group of amendments, enacted in 1970, to the Investment Company Act of 1940. Congress decided that mutual funds deserved special regulation because:
 
 
 103
 Mutual funds, with rare exception, are not operated by their own employees. Most funds are formed, sold, and managed by external organizations, that are separately owned and operated. These separate organizations are usually called investment advisers. The advisers select the funds' investments and operate their businesses. For these services they receive management or advisory fees.
 
 
 104
 * * *
 
 
 105
 Because of the unique structure of this industry the relationship between mutual funds and their investment adviser is not the same as that usually existing between buyers and sellers or in conventional corporate relationships. Since a typical fund is organized by its investment adviser which provides it with almost all management services and because its shares are bought by investors who rely on that service, a mutual fund cannot, as a practical matter sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy.
 
 
 106
 S.Rep. No. 184, 91st Cong., 2d Sess. 5, reprinted in 1970 U.S.Code Cong. & Ad.News 4897, 4901.
 
 
 107
 The primary method by which Congress sought to control the peculiar problems of mutual funds was the requirement that at least forty percent of fund directors be independent. These "unaffiliated" directors are given the main burden of supervising the management and the finances of the fund. See Burks v. Lasker, 441 U.S. at 482-83, 99 S.Ct. at 1839-40. In certain areas of the funds' dealings, however, Congress did not leave matters to final resolution by the unaffiliated directors. Rather, it mandated alternative forms of regulation. One area of special concern is the compensation paid by a mutual fund to its adviser. The Senate Report vividly points up that concern:
 
 
 108
 In the case of management fees, the committee believes that the unique structure of mutual funds has made it difficult for the courts to apply traditional fiduciary standards in considering questions concerning management fees.
 
 
 109
 Therefore your committee has adopted the basic principle that, in view of the potential conflicts of interest involved in the setting of these fees, there should be effective means for the courts to act where mutual fund shareholders or the SEC believe there has been a breach of fiduciary duty. This bill would make it clear that, as a matter of Federal law, the investment adviser or mutual fund management company has a fiduciary duty with respect to mutual fund shareholders. It provides an effective method whereby the courts can determine whether there has been a breach of this duty by the adviser or by certain other persons with respect to their compensation from the fund.
 
 
 110
 S.Rep. No. 184, 91st Cong., 2d Sess. 2, reprinted in 1970 U.S.Code Cong. & Ad.News 4897, 4898 (emphasis added). Referring to what is now section 36(b), the Senate Report observes:
 
 
 111
 This section is not intended to authorize a court to substitute its business judgment for that of the mutual fund's board of directors in the area of management fees. It does, however, authorize the court to determine whether the investment adviser has committed a breach of fiduciary duty in determining or receiving the fee.
 
 
 112
 * * *
 
 
 113
 * * *
 
 
 114
 Directors of the fund, including the independent directors, have an important role in the management fee area. A responsible determination regarding the management fee by the directors including a majority of disinterested directors is not to be ignored. While the ultimate responsibility for the decision in determining whether the fiduciary duty has been breached rests with the court, approval of the management fee by the directors and shareholder ratification is to be given such weight as the court deems appropriate in the circumstances of a particular case.
 
 
 115
 * * *
 
 
 116
 * * *
 
 
 117
 Under this proposed legislation either the SEC or a shareholder may sue in court on a complaint that a mutual fund's management fees involve a breach of fiduciary duty.
 
 
 118
 Id. at 4902-03 (emphasis added). This report plainly discloses that while the court must afford deference to the views of fund directors, the ultimate responsibility for deciding whether the fees are so high as to be regarded as a breach of fiduciary duty is judicial. Nowhere in the legislative history of section 36 is there any suggestion that fund directors--even unaffiliated directors--can seek such a judicial determination. Only the SEC and shareholders are indicated. With that illuminating legislative history in mind we turn to the statute as enacted.
 
 
 119
 Prior to 1970, section 36 of the ICA authorized the SEC to seek an injunction barring persons in a fiduciary relationship to a fund from acting in such capacity if they were in the five years prior to the action guilty of "gross misconduct or gross abuse of trust." Investment Companies Act of 1940, Pub.L. No. 76-768, Sec. 36, 54 Stat. 841 (1940). No other relief was authorized. In 1970 section 36 was amended to eliminate the "gross misconduct or gross abuse of trust" standard so as to authorize an SEC suit if the fiduciary "has engaged ... or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company...." 15 U.S.C. Sec. 80a-35(a) (1976). The relief available in an SEC suit was also enlarged so as to permit not only orders barring future participation as a fiduciary, but also "such injunctive or other relief against such person as may be reasonable in the circumstances...."
 
 
 120
 At the same time an entirely new remedy, dealing specifically with adviser compensation, was added in a new subsection 36(b).[9] It authorizes an action "by the Commission, or by a security holder of such registered investment company, against such investment adviser, ... for breach of a fiduciary duty in respect of ... compensation...." 15 U.S.C. Sec. 80a-35(b) (1976).
 
 
 121
 There are several significant features to the 1970 amendment to section 36. In the 1940 Act, the section dealt only with SEC enforcement, and the sole remedy was to bar the offender from the investment company industry. Section 36 created no cause of action, express or implied, in favor of a fund. The 1970 amendments both carried forward and broadened the SEC enforcement powers in section 36(a). Plainly the "other relief" available under that section would include an accounting which would inure to the benefit of a defrauded fund--not to the SEC. Yet there is no suggestion that the fund could plead a cause of action for the same relief which would be available under section 36(a) in an action by the SEC. As Judge Tyler observed:
 
 
 122
 section 36(a) of the Investment Company Act, 15 U.S.C. Sec. 80a-35(a), authorizes the SEC to bring actions against certain individuals or companies for breaches of fiduciary duty involving personal misconduct. Section 36(a), however, authorizes an action by the SEC, not by private individuals. Although this should not be read to prohibit suits by individuals when other sections of the Investment Company Act are violated, when only a general breach of fiduciary duty is alleged, a private suit should more properly be brought in state court.
 
 
 123
 Monheit v. Carter, 376 F.Supp. 334, 342 (S.D.N.Y.1974). A section 36(a) action by the SEC may be considered "derivative" in the sense that it may right a wrong committed against a fund, and may even obtain relief in favor of a fund, but it certainly is not "derivative" in the sense that the section 36(a) cause of action belongs to the fund in the first instance. It is only to such a cause of action that Rule 23.1 has any application.
 
 
 124
 Turning to the new cause of action created in section 36(b) with respect to adviser compensation, we cannot, in determining legislative intention, overlook the significant fact that Congress chose to house it not in a separate provision, but as an amendment to a section which from the beginning dealt with public rather than private enforcement. While subsection 36(b) does not say in as many words "a state law business judgment rule cannot terminate an action under this section," permitting the directors of a fund to exercise business judgment in order to prevent an SEC action would be inconsistent with the provision that
 
 
 125
 [i]n any such action approval by the board of directors of such investment company of such compensation or payments ... and ratification or approval of such compensation or payments ... shall be given such consideration by the court as is deemed appropriate under all the circumstances.
 
 
 126
 15 U.S.C. Sec. 80a-35(b)(2) (1976). Whereas under the typical state law business judgment rule the disinterested directors' decision exercised in good faith binds the court, under section 36(b) the court must make an independent judgment. Moreover, no distinction is made, in this respect, between an action brought by the SEC and one brought by a shareholder. It seems to me, therefore, that by creating the SEC cause of action and the shareholder action in the same sentence, and housing both in a section of the ICA which historically dealt with public rather than private enforcement, Congress disclosed a rather clear intention that the stockholder action be a variety of private attorney general action, i.e., outside the control of the fund's directors. That intention is strongly confirmed by the excerpts from the Senate Report quoted above. It is confirmed, moreover, by the absence of any provision in section 36(a) or (b) for a cause of action by the fund itself.
 
 
 127
 The majority concludes, despite the absence of any provision in section 36 for a suit by the fund, that the cause of action does belong to the fund, and thus falls within the terms of Rule 23.1. To affirm, the majority must make this assertion, for if the security holders' cause of action is not one which the fund could assert, it is not derivative, at least not in the sense of Rule 23.1. The majority, however, points to no legislative history suggesting that the fund can bring a section 36(b) suit. I do not believe the omission of a provision for suits by the fund itself was inadvertent. If the fund were authorized to sue, a litigated or, more significantly, a consent judgment would raise serious questions of the preclusive effect of the judgment on any subsequent action by the SEC or a shareholder.[10] The most likely interpretation is that Congress intended to create a cause of action solely by the SEC, or by a shareholder acting in a private attorney general capacity, so as to preclude consent judgments entered into by the fund and which might have the effect of precluding the judicial review of director judgment mandated by 15 U.S.C. Sec. 80a-35(b)(2). Such an intention is suggested by legislative history indicating that one of the reasons for expressly allowing suit to be brought by either the SEC or a security holder was the congressional assessment that the fund directors could not effectively deal with adviser compensation. The Senate Report stated that the 1970 amendments to the ICA were predicated on the SEC's 1966 report and recommendations on investment companies. "Public Policy Implication of Investment Company Growth," Report of the Committee on Interstate and Foreign Commerce, H.R.Rep. No. 2337, 89th Cong., 2d Sess. (1966). In that report, the SEC indicated its judgment that:
 
 
 128
 The unaffiliated directors, as the only potentially disinterested persons in the management of most investment companies, can and should play an active role in representing the interests of shareholders not only in connection with management compensation but in other areas where the interests of the professional managers may not coincide with those of the company and its public investors. Strengthening the voice of truly disinterested directors in investment company affairs is important to the protection of public shareholders. But even a requirement that all of the directors of an externally managed investment company be persons unaffiliated with the company's adviser-underwriter would not be an effective check on advisory fees and other forms of management compensation.
 
 
 129
 The unaffiliated directors are not in a position to bargain on an equal footing with the adviser on matters of such crucial importance to it. They are not free, as a practical matter, to terminate established management relationships when differences arise over the advisory fees or other compensation. This reflects, in large part, the adviser-underwriter permeation of investment company activities to an extent that makes rupture of the existing relationships a difficult and complex step for most companies. For these reasons, arm's-length bargaining between the unaffiliated directors and the managers on these matters is a wholly unrealistic alternative.
 
 
 130
 Id. at 148 (emphasis supplied). It seems unlikely that Congress intended that the unaffiliated directors, by bringing and settling a section 36(b) suit, could accomplish the very result that the SEC regarded as an unrealistic alternative. Thus I do not believe that section 36(b) grants "a right which may properly be asserted by [the fund]." Fed.R.Civ.P. 23.1.
 
 
 131
 Even if, contrary to its plain language and probable purpose, section 36(b) were to be construed as creating "a right which may properly be asserted by [the fund]," id., there would still remain the question whether the disinterested directors of the fund may, in the exercise of business judgment, prevent a judicial examination, sought by the SEC or a security holder, of advisers fees. Other aspects of the section support a negative answer. There is a one year period of limitation. 15 U.S.C. Sec. 80a-35(b)(3). Such a short period suggests that intervention by fund directors was not contemplated, for if a claim were to be delayed until the directors were notified and were given a chance to consider the advisability of a given action, the statutory period would quickly run out. By adjusting fees prospectively, while delaying the decision on whether to sue for fees already paid, fund managers could significantly reduce recovery. The normal delays incident to corporate decision-making are incompatible with a one year period of limitation, and director involvement therefore must have been discounted by Congress. Another aspect suggesting the inapplicability of the business judgment rule to section 36(b) is the circumscribed nature of a 36(b) cause of action. Recovery is limited to actual damages capped by the total compensation paid. Recovery can only be had from the recipients of compensation, and liability cannot be the predicate for an injunction severing an investment adviser from a fund. These limitations on the section 36(b) remedy minimize the intrusion by the section upon the directors' responsibility to operate the fund, and suggest the absence of any serious erosion of the management responsibility conferred by state law.
 
 
 132
 I conclude, therefore, that the Rule 23.1 demand requirement does not apply to a section 36(b) action, because the section does not provide "a right which may properly be asserted by [the fund]", and because even assuming such a right, section 36(b)(2) preempts any state law business judgment rule which would be furthered by the demand requirement.
 
 
 133
 This interpretation of section 36(b) has been anticipated by the Supreme Court. In Burks v. Lasker, 441 U.S. at 484, 99 S.Ct. at 1840, the Court stated that:
 
 
 134
 [w]hen Congress ... intend[ed] to prevent board action from cutting off derivative suits, it said so expressly. Section 36(b), ..., 15 U.S.C. Sec. 80a-35(b)(2), added to the [Investment Company] Act in 1970, performs precisely this function for derivative suits charging breach of fiduciary duty with respect to adviser's fees.
 
 
 135
 The holding in Burks v. Lasker that the state law business judgment rule permits independent directors to terminate derivative suits based on federal statutes so long as the rule is consistent with the policies of the federal statutes in issue, puts the quoted statement in context. The application of business judgment to terminate a section 36(b) suit is inconsistent with the policy of that section. The majority treats the statement of the Burks Court as mere dictum which this court can disregard. If it is dictum, it is dictum of the most compelling sort. The quoted passage was not a passing reference, but was integrally tied to the Court's holding and reasoning. The Court supported its position about fund directors' power to terminate other derivative actions by pointing to section 36(b) as an example of Congress, in clear terms, preventing director veto. The Burks reasoning depends, therefore, on the quoted dictum with respect to section 36(b) and it cannot be disregarded by this intermediate court.
 
 
 136
 The Court of Appeals for the Second Circuit, which in matters relating to the federal securities law carries particular authority, confronted with the identical problem, reached the same conclusion with respect to section 36(b) as I reach. Moreover it concluded, as I do, that Rule 23.1 is inapplicable because, as Burks v. Lasker teaches, it is designed to implement the business judgment rule only in cases where directors can control a lawsuit. Fox v. Reich & Tang, Inc. and Daily Income Fund, Inc., 692 F.2d 250 (2d Cir.1982).
 
 
 137
 Despite the unambiguous statement in Burks v. Lasker that section 36(b) is an instance in which Congress has precluded the application of any state law business judgment rule, the Court of Appeals for the First Circuit recently affirmed the dismissal of a section 36(b) action for failure to plead compliance with the demand requirement of Rule 23.1. Grossman v. Johnson, 674 F.2d 115 (1st Cir.1982). With deference, I am not persuaded by that court's interpretation of the statute, its treatment of the legislative history, or its reading of Burks v. Lasker. Thus while the Grossman v. Johnson opinion supports the defendants, I would not follow it. I find particularly unpersuasive the Grossman court's treatment of 15 U.S.C. Sec. 80a-35(b)(2) (1976). While acknowledging that the section "can easily be read to give the court, rather than the directors, the ultimate power to decide the propriety of the fees," it reasoned that a demand would not be futile, because the directors' "decision to side with the complainant (entirely or in part) would have important consequences, and even their knowledgeable disagreement with the demand might be deemed worthy by the court of grave consideration under Sec. 36(b)(2)." 674 F.2d at 121. Section 36(b)(2) explicitly directs the court to give the directors' views "such consideration ... as is deemed appropriate under all the circumstances." 15 U.S.C. Sec. 80a-35(b)(2) (1976). Obviously those views can be made known during the course of the lawsuit. But the court's obligation to take the directors' views into account does not, even under the Grossman court's analysis permit the directors to terminate or to prohibit the security holders' action. Thus the demand which that court required served no purpose but to delay judicial inquiry and to insulate more payments to the investment adviser from such judicial review by operation of the short statute of limitations in section 36(b)(3). Since the directors' business judgment is to be considered relevant to a section 36(b) claim only to the limited extent that the court must take the directors' views into account, any state law business judgment rule is clearly supplanted. What must be reconciled is section 36(b)(2) and Rule 23.1. No federal policy suggests itself which would support a mechanistic application of the demand requirement when the only purpose to be served is to give the directors an opportunity to make their views known to the court. That can be done in an appropriate pleading.
 
 
 138
 The majority's analysis, relying on Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), is as flawed as that of the Grossman court. It must be noted that the Cort v. Ash test for implying causes of action in favor of parties not mentioned in a federal statute has been significantly contradicted by subsequent cases such as Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981), and Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981). We must look for a clear indication of congressional intent to afford such a cause of action. Neither the statutory language nor its legislative history contains any such indication of an intent to permit an investment fund to control a section 36(b) claim and thereby insulate it from judicial review. Indeed, as I have outlined above, a contrary intent is the most likely.
 
 
 139
 Finally, the majority's reliance on Merrill Lynch, Pierce, Fenner & Smith v. Curran, --- U.S. ----, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), is an extreme misinterpretation of that authority. The Curran case found a congressional intention, when amending the Commodity Exchange Act by the Commodity Futures Trading Act of 1974, to recognize that prior to the amendment lower federal courts had implied causes of action from the former although it did not expressly provide for them. No cause of action had been implied for the entirely new cause of action created in section 36(b) because that cause of action did not exist at the time Congress last spoke. The suggestion that the Curran analysis applies because a fund could bring a common law action against an adviser for corporate waste demonstrates confusion about the nature of the problem which the Curran Court addressed. Common law causes of action are not "implied" from federal statutes. They exist as a matter of state law. Moreover, the suggestion ignores the clear intention, in section 36(b), to create a right to recover overcharges which could not be recovered under the state common law of waste.
 
 V.
 
 140
 Since the governing federal law does not permit direct control over section 36(b) actions, it supplants the applicable state law business judgment rule. No section 36(b) policy would be advanced by applying the demand requirement of Rule 23.1 to section 36(b) actions. Absent an underlying substantive rule of law which the pleading requirements of Rule 23.1 would advance, their application serves no useful purpose. The trial court erred, therefore, in dismissing the complaint for failure to plead that a demand had been made on the directors. The judgment appealed from should be affirmed insofar as it dismissed all claims other than that predicated on section 36(b), but reversed insofar as it dismissed that claim.[11] Thus I dissent from the judgment of this court insofar as it affirms the dismissal of the section 36(b) claim.
 
 
 
 [1]
 In January 1980, when the advisory contracts at issue were approved, the board consisted of six members
 
 
 [2]
 The court also dismissed the action against defendant James L. Robinson for insufficient service of process. That portion of the district court's order has not been appealed
 
 
 [3]
 Section 36(b) provides, in relevant part:
 For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. With respect to any such action the following provisions shall apply:
 (1) It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.
 (2) In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate under all the circumstances.
 (3) No such action shall be brought or maintained against any person other than the recipient of such compensation or payments, and no damages or other relief shall be granted against any person other than the recipient of such compensation or payments. No award of damages shall be recoverable for any period prior to one year before the action was instituted. Any award of damages against such recipient shall be limited to the actual damages resulting from the breach of fiduciary duty and shall in no event exceed the amount of compensation or payments received from such investment company, or the security holders thereof, by such recipient.
 15 U.S.C. Sec. 80a-35(b) (1976).
 
 
 [4]
 Independent directors are those who are not "interested" in the company or its advisers. The amendments define "interested person" to include persons who have close family ties or substantial financial or professional relationships with the investment company or its advisers, or who have beneficial or legal interests in securities issued by the adviser or underwriter
 
 
 [5]
 The belated nature of this argument is evidenced by Weiss' pleadings, which characterize the action as one brought "derivatively on behalf of the Fund." Amended Complaint at p 2(b)
 
 
 [6]
 Rule 23.1 states in pertinent part:
 In a derivative action brought by one or more shareholders or members to enforce a right of a corporation, ... the corporation ... having failed to enforce a right which may properly be asserted by it, the complaint shall allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors ... and the reasons for his failure to obtain the action or for not making the effort.
 The Rule establishes other derivative suit requirements such as contemporaneous ownership of stock by the plaintiff when the alleged wrong occurred. These additional requirements are not at issue in this appeal and references here to "Rule 23.1" are limited to the demand requirement unless otherwise noted.
 
 
 [7]
 The Second Circuit has rejected this argument. Fox v. Reich & Tang, Inc., 692 F.2d 250 (2d Cir.1982); see infra pp. 934-935
 
 
 [8]
 We recognize that implication of the corporation's right of action by a statute expressly authorizing suit by shareholders is somewhat atypical of the cases employing the Cort test. Three recent Supreme Court opinions illustrate the usual application of the Cort test in situations where the statute fails to specify either a private remedy or a cause of action for the particular relief sought. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, --- U.S. ----, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) (finding private rights of action for violations of the Commodity Exchange Act); Middlesex County Sewerage Authority v. National Sea Clammers Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) (finding no implied private right of action for damages under the Federal Water Pollution Control Act or the Marine Protection, Research, and Sanctuaries Act of 1972); Texas Industries, Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981) (antitrust laws do not give rise to implied right of contribution)
 
 
 [9]
 The common law predecessor to a section 36(b) action was a suit against the adviser for "corporate waste," an action traditionally deemed to be derivative. 13 W. Fletcher, Cyclopedia of the Law of Private Corporations paragraphs 5924, 5926, 5927 (rev. perm. ed. 1980). Congress found the burden of proving corporate waste "unduly restrictive" and created the fiduciary duties in section 36(b) to reduce the burden of invalidating advisory contracts. S.Rep. No. 184, 91st Cong., 1st Sess. 5 (1969), reprinted in 1970 U.S.Code Cong. & Ad.News 4897, 4901. Because the common law action was derivative, we assume Congress expected the federal action to be derivative as well
 
 
 [10]
 The First Circuit, in rejecting the identical argument, suggested that the district court could allow suit to go forward without waiting for a response if the directors unduly postpone a response to demand. Grossman v. Johnson, supra, 674 F.2d at 122. We intimate no view here concerning the propriety of that suggestion
 
 
 [11]
 Additionally we note that the short statute of limitations may reflect a Congressional view of the ICA as designed to ameliorate the situation prospectively rather than to establish a long damage period
 
 
 [12]
 Lewis was published after the briefs in this appeal were filed
 
 
 [13]
 The directors were accused of entering into a wasteful settlement agreement with a shareholder. Pursuant to the agreement the shareholder abandoned his proxy contest in which he was seeking a seat on the corporation's board. The complaint also alleged details of a larger scheme by the directors to retain control of the corporation by, among other things, obtaining long-term employment contracts for several directors and reducing the number of directors on the board
 
 
 [14]
 The Court's holding in Hawes was adopted in 1882 as Equity Rule 94, and was modified in 1912 by Equity Rule 27 to allow allegations of the futility of demand. Equity Rule 27 became Federal Rule of Civil Procedure 23(b) which, in turn, was promulgated as Rule 23.1 in 1966
 
 
 [15]
 At issue in Cramer was whether a determination by a disinterested committee of directors that a litigation was not in the best interests of the corporation barred a shareholder suit alleging violations in connection with GTE's foreign payments. The plaintiff had not made a Rule 23.1 demand, however, and we affirmed dismissal of the suit on that ground
 
 
 [16]
 As appellees note, the directors can respond to a timely shareholder demand by (1) negotiating a rebate of fees, (2) satisfying the shareholder that the fees are reasonable in terms of the investment services provided, (3) persuading the shareholder that litigation would adversely affect shareholders' interests, (4) accepting the demand and instituting suit, or (5) refusing the demand
 
 
 [17]
 Weiss' argument is also undermined by reference to Sec. 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78p(b) (1976) which he invoked in another context. See supra pp. 937-938. In a Sec. 16(b) action, where there is no power by the corporation to terminate, see Burks v. Lasker, supra, 441 U.S. at 484, n. 13, 99 S.Ct. at 1840, n. 13; Cramer, 582 F.2d at 276 n. 22, there is an express demand requirement
 
 
 [18]
 Relying in part on Lewis, the Second Circuit suggested in Fox v. Reich & Tang, supra, that the demand requirement would serve no function in the Sec. 36(b) context. "[I]t is possible to infer that Congress ... believed directors would always be so 'interested' that demand would inevitably be 'excused.' " Id., slip op. at n. 13. Having already explained our conclusion to the contrary, we simply note the tentative nature of the Second Circuit's language
 
 
 [19]
 As noted above, see supra p. 935, we must presume that the federal rules apply to this action unless expressly displaced by Congress
 
 
 [20]
 This conclusion was cited with approval in our decision in Lewis v. Curtis, supra, 671 F.2d at 785
 
 
 [21]
 Lewis v. Curtis, supra, which was decided after the district court's decision below, does not mandate a different conclusion. As did Kauffman, Lewis held that the futility of demand turns on the interestedness of the directors rather than the nature of the wrongdoing. See supra pp. 938-939. Unlike this case, however, Lewis involved specific allegations of a self-interested transaction by all the directors. See 671 F.2d at 787
 
 
 [1]
 The district court's opinion is reported. Weiss v. Temporary Investment Fund, Inc., 516 F.Supp. 665 (D.Del.1981). Plaintiff also appeals from the court's denial of his subsequent motion for leave to comply with Rule 23.1 and to file an amended complaint. 520 F.Supp. 1098 (D.Del.1981)
 
 
 [2]
 15 U.S.C. Sec. 80a-35(b) (1976)
 
 
 [3]
 Specifically section 14(a), 15 U.S.C. Sec. 78n(a) (1976), and Rule 14a-9, 17 C.F.R. Sec. 240 (1977), adopted thereunder
 
 
 [4]
 Specifically sections 16 and 21, 12 U.S.C. Secs. 24 & 378(a) (1976)
 
 
 [5]
 Specifically sections 20(a), 1(b)(2), 15(a) and 15(b), 15 U.S.C. Secs. 80a-1--80a-52
 
 
 [6]
 The court also dismissed the complaint as to defendant Robertson for insufficient service of process on him. Plaintiff does not challenge that ruling on appeal, so we leave the court's judgment in that respect undisturbed
 
 
 [7]
 The demand requirement of Rule 23.1 reads:
 The complaint shall also allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort.
 Fed.R.Civ.P. 23.1.
 
 
 [8]
 Rule 23.1 was promulgated in 1966. It substantially restated prior Rule 23(b) adopted in 1937 which in turn was a transcription of Equity Rule 27. Equity Rule 27, established in 1912, was itself a slight modification of Equity Rule 94 adopted in 1882. The demand requirement of Equity Rule 94 read:
 [the complaint] must also set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, and, if necessary, of the shareholders, and the causes of his failure to obtain such action.
 104 U.S. at X.
 
 
 [9]
 Section 36(b) reads:
 For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect of such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person. With respect to any such action the following provisions shall apply:
 (1) It shall not be necessary to allege or prove that any defendant engaged in personal misconduct, and the plaintiff shall have the burden of proving a breach of fiduciary duty.
 (2) In any such action approval by the board of directors of such investment company of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, and ratification or approval of such compensation or payments, or of contracts or other arrangements providing for such compensation or payments, by the shareholders of such investment company, shall be given such consideration by the court as is deemed appropriate under all the circumstances.
 (3) No such action shall be brought or maintained against any person other than the recipient of such compensation or payments, and no damages or other relief shall be granted against any person other than the recipient of such compensation or payments. No award of damages shall be recoverable for any period prior to one year before the action was instituted. Any award of damages against such recipient shall be limited to the actual damages resulting from the breach of fiduciary duty and shall in no event exceed the amount of compensation or payments received from such investment company, or the security holders thereof, by such recipient.
 (4) This subsection shall not apply to compensation or payments made in connection with transactions subject to section 80a-17 of this title, or rules, regulations, or orders thereunder, or to sales loans for the acquisition of any security issued by a registered investment company.
 (5) Any action pursuant to this subsection may be brought only in an appropriate district court of the United States.
 (6) No finding by a court with respect to a breach of fiduciary duty under this subsection shall be made a basis (A) for a finding of a violation of this subchapter for the purposes of sections 80a-9 and 80a-48 of this title, section 78o of this title, or section 80b-3 of this title, or (B) for an injunction to prohibit any person from serving in any of the capacities enumerated in subsection (a) of this section.
 15 U.S.C. Sec. 80a-35(b) (1976).
 
 
 [10]
 See 13 Fletcher Cyc. Corp. Sec. 6043 (Permanent Ed.) and cases cited therein
 
 
 [11]
 I also agree that the district court did not abuse its discretion by denying plaintiff leave to make subsequent demand on the directors and to replead